UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
                                    :
IN RE: NINE WEST LBO SECURITIES     :
LITIGATION                          :
                                    :      20 MD. 2941 (JSR)
Pertains to All Associated Actions  :
                                    :      OPINION AND ORDER
                                    :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

    This multidistrict litigation arises from the 2014
leveraged buyout (the "LBO") of the fashion retail company, The
Jones Group, Inc. ("Jones Group"). Plaintiffs — consisting of
Marc Kirschner, as trustee for the Nine West Litigation Trust
representing unsecured creditors (the "Litigation Trustee"), and
Wilmington Savings Fund Society, FSB as successor indenture
trustee for various notes issued by Nine West (the "Indenture
Trustee") — bring these consolidated actions against officers,
directors, and shareholders of Jones Group, claiming breach of
fiduciary duty, aiding and abetting breach of fiduciary duty,
fraudulent conveyance, unjust enrichment, and other assorted
state law claims arising out of the bankrupting, and bankruptcy,
of the company in connection with the LBO.

    Specifically, plaintiffs allege that the defendant officers
and directors arranged for the company to merge with an
affiliate of Sycamore Partners Management, L.P. ("Sycamore"), a
private equity company, and sold off valuable "crown jewel"

1

businesses to other Sycamore affiliates for a fraction of their real price. The result was to leave what remained, now called Nine West Holding Inc. ("Nine West"), bereft of its most successful product lines and with over $1.5 billion in debt, of which more than $1 billion was prior Jones Group debt.

Pursuant to the Court's June 12, 2020 scheduling order, now before the Court are two motions to dismiss – one on behalf of the shareholder defendants and the other on behalf of the director and officer defendants (the "D&O defendants") – relating to those claims arguably affected by the safe harbor found in 11 U.S.C. § 546(e). Both the shareholder defendants and the D&O defendants argue that certain payments made to them in connection with the LBO are shielded from the fraudulent conveyance and unjust enrichment claims under the § 546(e) "safe harbor."

These motions are litigated in the shadow of In re Tribune Company Fraudulent Conveyance Litigation, 946 F.3d 66 (2d Cir. 2019), petition for cert. filed, 2020 WL 3891501 (U.S. July 6, 2020), a recent Second Circuit opinion that examined the scope of the § 546(e) safe harbor in the context of a leveraged buyout. There, the Second Circuit held that when a bank serves as a paying agent to help a company effectuate payments to its shareholders in connection with a securities contract, all payments made in connection with that securities contract are

safe harbored from a bankruptcy trustee's avoidance powers with respect to certain fraudulent conveyance claims. Id. at 72. Despite plaintiffs' best efforts to distinguish Tribune's holding from the issues presented by the instant motions, the Court holds that Tribune largely controls these issues, and therefore grants both motions to dismiss.

I.   Factual Background[1]

A. The Merger and the Shareholder Payments

Prior to the merger, Jones Group was a publicly traded global footwear and apparel company. Compl. ¶ 45. In 2014, Sycamore, a private equity firm, acquired Jones Group through an LBO transaction.[2] Id. ¶¶ 52-60. Sycamore effectuated the

---

[1]    Plaintiffs in this multidistrict litigation have filed seventeen virtually identical complaints. After the motions to dismiss were briefed, amended complaints were filed in certain actions pursuant to Fed. R. Civ. P. 15(a)(1)(B). The amendments were mostly technical. Because plaintiffs do not object to the pending motions being treated as addressed to the amended pleadings, Plaintiffs' Memorandum of Law in Opposition to Former Director and Officer Defendants' Motion to Dismiss Under 11 U.S.C. § 546(e) ("Pls' D&O Mem."), Dkt. No. 272, at 5 n.5, the Court cites, unless otherwise noted, to the amended complaint filed in Kirschner, et al. v. McClain et al., No. 20-cv-4262, Dkt. No. 110. Each cited allegation is also found in the other operative complaints, and every reference to the "Complaint" hereinafter effectively refers to each of the complaints in these actions.

[2]    "In a typical LBO, a target company is acquired with a significant portion of the purchase price being paid through a

transaction by creating a new subsidiary — Jasper Parent — into which Jones Group was merged and ultimately renamed Nine West Holdings, Inc. ("Nine West"). Id. ¶ 132.

As part of the LBO, several payments were made to Jones Group shareholders, directors, and officers. First, shares of common stock were cancelled and converted into the right to receive $15 in cash; in total, Nine West paid Jones Group's public shareholders $1.105 billion for the common shares. Id. ¶¶ 61, 135. Second, shares of restricted stock and stock equivalent units, held by directors and officers, were likewise cancelled and converted into the right to receive $15 in cash, plus any unpaid dividends that had accumulated on those restricted shares; in total, Nine West paid Jones Group's directors and officers $78 million in connection with those shares. Id. In addition, Nine West paid approximately $71 million in change in control payments to certain directors and officers. Id. ¶ 40; Pls' D&O Mem. App. 1.

In the Complaint, plaintiffs refer to the above-mentioned payments, including common shares, restricted shares, share equivalent units, and unpaid dividends, as "shareholder transfers." Compl. ¶ 41. They allege that the $1.105 billion

---

loan secured by the target company's assets." Tribune, 946 F.3d at 71 n.

common share payments, made to the public shareholders, were
effectuated through a different mechanism than were the payments
in connection with the restricted stock, stock equivalent units,
accumulated dividends, and change in control payments made to
the directors and officers. Id. ¶ 135.

With respect to the common shares, plaintiffs allege the
payments "were made by a non-agent contractor that performed the
ministerial function of processing share certificates and cash,
and whose rights and obligations were governed solely by
contract." Id. However, the merger agreement that governed the
transaction specified that such payments were to be made by a
"paying agent" and "pursuant to a paying agent agreement in
customary form."[3] See Declaration of Andrew G. Devore in Support
of Public Shareholder Defendant's Motion to Dismiss Under the
Safe Harbor of 11 U.S.C. § 546(e) ("Devore Decl."), Dkt. No. 92-
2 (the "Merger Agreement"), § 4.2. The Paying Agent Agreement,

---

[3]   Plaintiffs acknowledge that the Merger Agreement is
incorporated in the Complaint. See Plaintiffs' Memorandum of Law
in Opposition to Public Shareholder Defendants' Motion to
Dismiss Under 11 U.S.C. § 546(e) ("Pls' Shareholder Mem."), Dkt.
No. 271, at 6. In any event, as discussed below, the Court holds
that certain documents central to the transaction at issue here
— viz., the Merger Agreement and the Paying Agent Agreement —
are "integral" to the Complaint and therefore appropriate for
the Court to consider at the 12(b)(6) stage. Chambers v. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Accordingly, the
Court relies on those documents in the statement of facts.

in turn, identifies the paying agent as Wells Fargo.[4] Devore

Decl., Dkt. No. 92-1 (the "PAA"), at 2. The PAA was signed by

three parties: Nine West, Jasper Parent, and Wells Fargo. Id.

While it empowers Wells Fargo to "act as [Nine West's] special

agent for the purpose of distributing the Merger Consideration,"

it also tasks Jasper Parent with key roles in the effectuation

of the payments, including depositing with Wells Fargo the money

to complete the transaction. Id. at 2, § 1.4. And the PAA

assigns Nine West different responsibilities depending on

whether the payments were for book-entry securities or

certificate securities.[5] Id. § 1.3.

As for the restricted shares, share equivalent units, and

unpaid dividends, the Complaint alleges that the payments "were

processed through the payroll and by other means." Compl. ¶ 135.[6]

---

[4]   Plaintiffs also acknowledged the identity of Wells Fargo in
the Status Report they filed with this Court on June 10, 2020.
See 20-md-2941, Dkt. No. 10 at 8.

[5]   Book-entry securities are investments whose ownership is
recorded electronically. By contrast, certificate securities are
investments whose ownership is recorded with a stock
certificate.

[6]   The Complaint does not contain any allegations with respect
to how the change in control payments were effectuated, although
plaintiffs suggest in their briefing that they were processed in
the same manner as the restricted shares, share equivalent
units, and accumulated dividends. See Pls' D&O Mem. at 2.
Because the D&O defendants have not yet moved to dismiss the
claims relating to the change in control payments, this question
is ultimately beyond the scope of the instant motions.

The Merger Agreement further specifies that, upon the completion of the merger, the restricted shares and the share equivalent units would be cancelled, and the holder of each share would be entitled to $15 in cash, "plus any unpaid dividends that have accumulated on such Restricted Share." Merger Agreement § 4.3

A. Procedural History

In April 2018, roughly four years after the merger closed, Nine West filed for bankruptcy. Compl. ¶¶ 7, 147. The bankruptcy court approved Nine West's Chapter 11 plan in February 2019. Id. ¶¶ 13-17. Under that plan, the Litigation Trustee is empowered to bring putative claims on behalf of Nine West's estate arising from the merger, and the Indenture Trustee is authorized to assert fraudulent conveyance claims against former shareholders of Jones Group. Id. ¶¶ 15-16.

As relevant here, the Litigation Trustee brings state law constructive and intentional fraudulent conveyance claims challenging the above-mentioned payments pursuant to 11 U.S.C. § 544, which grants the bankruptcy trustee the authority to bring state law claims to avoid and recover transfers of a debtor that unsecured creditors would have been able to assert outside of bankruptcy. In addition, the Litigation Trustee brings unjust enrichment claims against certain directors and officers seeking disgorgement and restitution of the payments these defendants received in connection with the merger. The Indenture Trustee

also brings constructive and intentional fraudulent conveyance claims challenging the same payments but pursuant only to state law.

Now before the Court are two motions to dismiss certain of these claims. First, the public shareholder defendants[7] move to dismiss plaintiffs' intentional and constructive fraudulent conveyance claims. Dkt. No. 88. Second, the D&O defendants[8] move

---

[7]   The moving shareholder defendants are identified in the signature pages to their memo in support of their motion to dismiss. Others have joined in that motion. See 20-md-2941, Dkt. Nos. 95, 100, 101, 108, 112, 115, 135, 143, 149, 155, 157, 159, 178, 181, 184, 189, 192, 195, 202, 204, 205, 210, 214, 218, 225, 231, 240, 243, 251, 264, 268, 276, 282, 300, 309, 314, and 316.

[8]   The Director Defendants who have moved to dismiss are Gerald C. Crotty, John D. Demsey, Robert L. Mettler, Mary Margaret Hastings Georgiadis, Matthew H. Kamens, Sidney Kimmel, Ann Marie C. Wilkins, James A. Mitarotonda, Jeffrey Nuechterlein, and Lowell W. Robinson. The Officer Defendants who have moved to dismiss are Christopher R. Cade, Wesley R. Card, Ira M. Dansky, Richard L. Dickson, Cynthia DiPietrantonio, Joseph T. Donnalley, Tami Fersko, John T. McClain and Aida Tejero-DeColli. In addition, the following former directors, officers, and employees who are alleged to have received payments in connection with restricted shares, share equivalent units, and unpaid dividends have joined in the D&O defendants' motion to dismiss: Irene A. Koumendouros, Ira Margulies, John D'Souza, Jack Gross, Patricia Kenny, Vincent Morales, Daniel Fishman, Frances Lukas, Mitchel Levine, Nicoletta Palma and Stephen C. Troy, Dkt. No. 101; Janet Carr, Dkt. No. 105; Kathleen Nedorostek Kaswell, Joseph Stafiniak, and Mary E. Belle, Dkt. No. 108; Nicola Guarna and Robert Rodriguez, Dkt. No. 112; Lynne Bernstock, Jeffery Brisman, Janice Brown, Katherine Butler, James Capiola, Gregory Clark, Eric Dauwalter, Mark DeZao, Beth Dorfsman, Eileen Dunn, Rosa Genovesi, Laurie Gentile, Bryan Gilligan, Ninive Giordano, Stacey Harmon, Richard Hein, Gerald Hood, Linda Kothe, Arundhati Kulkarni, Suzanne Maloney, Zine Mazouzi, Susan McCoy, Thomas Nolan, Pamela Paul, Charles Pickett, Amy Rapawy, Joseph Rosato, Mahmood Hassani-

to dismiss the plaintiffs' intentional and constructive fraudulent conveyance claims and the Litigation Trustee's unjust enrichment claims with respect to payments made in connection with restricted shares, share equivalent units, and accumulated dividends.[9] Dkt. No. 93.

II. Legal Analysis

In order to survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Unlike factual allegations, however, legal conclusions pleaded in a complaint are "not entitled to the assumption of truth." Iqbal, 556 U.S. at 679.

A. Considering Documents Outside the Complaint

―――――――――――

Sadi, Arlene Starr, Larissa Sygida, Kimberly Thomas, and Norman Veit, Dkt. No. 115; Whitney L. Smith, Dkt. No. 135; Heather Harlan and George Sharp, Dkt. No. 143; Jamie Cygielman, Harvest Street Capital, LLC, and Robyn Mills, Dkt. No. 189; Stefani Greenfield, Dkt. No. 218; Wayne Kulkin, Dkt. No. 235; and Kathleen O'Brien Gibber and Thomas Murray, Dkt. No. 264.

[9]     As confirmed at oral argument, the D&O defendants do not move to dismiss plaintiff's fraudulent conveyance claims with respect to the change in control payments. See Transcript of Oral Argument, August 13, 2020 ("Tr."), at 23:15-20.

The § 546(e) safe harbor is an affirmative defense. See In re Bernard L. Madoff Inv. Securities LLC, No. 11-MC-0012, 2011 WL 3897970, at *11 (S.D.N.Y. Aug. 31, 2011). "A court may dismiss a claim on the basis of an affirmative defense only if the facts supporting the defense appear on the face of the complaint." United States v. Space Hunters, Inc., 429 F.3d 416, 426 (2d Cir. 2005). For purposes of this rule, a court may also consider: (1) facts subject to judicial notice; (2) documents incorporated in the complaint by reference; or (3) documents integral to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). A document is "integral" where the complaint "relies heavily upon its terms and effect." Id.

A threshold question the Court must resolve is whether the Court may consider on these motions to dismiss the Paying Agent Agreement (the "PAA"), which is the agreement between the Jones Group, Jasper Parent, and Wells Fargo that lays out the terms under which Wells Fargo would effectuate the $1.105 billion in payments made to the public shareholders in the merger.

The shareholder defendants maintain that the PAA is both incorporated by reference in, and integral to, the Complaint. Memorandum of Law in Support of Public Shareholder Defendants' Motion to Dismiss Under the Safe Harbor of 11 U.S.C. § 546(e) ("Shareholder Defs' Mem."), Dkt. No. 90, at 9. First, they argue that the Complaint "contains a number of assertions about Wells

10

Fargo's role and the [PAA's] terms and effects." They point to a single example, where the Complaint references, but does not quote from, the PAA: In describing the effectuation of the shareholder payments, the Complaint alleges that the "payments for Common Shares in the LBO, totaling $1.105 billion, were made by a non-agent contractor that performed the ministerial function of processing share certificates and cash, and whose rights and obligations were governed solely by contract." Compl. ¶ 135. This "contract," the shareholder defendants explain, is the PAA. Shareholder Defs' Mem. at 9-10. Second, the shareholder defendants suggest that the rule allowing courts to consider omitted documents that are integral to the complaint is designed to deal with precisely this sort of situation, where plaintiffs have made a "strategic choice to omit" relevant documents. Id. at 10 (citing Williams v. GMAC Mort., Inc., No. 13-cv-4315, 2014 WL 2560605, at *1 (S.D.N.Y. June 6, 2014)); Reply Memorandum of Law in Further Support of Public Shareholder Defendants' Motion to Dismiss Under the Safe Harbor of 11 U.S.C. § 546(e) ("Shareholder Reply"), Dkt. No. 279, at 4 n.3 (citing Tulczynska v. Queens Hosp. Ctr., No. 17-cv-1669, 2019 WL 6330473, at *6-7 (S.D.N.Y. Feb. 12, 2019)).

    In response, plaintiffs insist that they have no obligation to plead or reference documents that the shareholder defendants want to use as evidence in support of an affirmative defense.

Pls' Shareholder Mem. at 15 (citing <u>Rosen v. Brookhaven Capital Management, Co. Ltd.</u>, 194 F. Supp. 2d 224, 227 (S.D.N.Y. 2002)). And plaintiffs further point out that the cases cited by the defendants are cases where the documents at issue were relevant to the plaintiff's <u>prima facie</u> claim. <u>Id.</u> Here, by contrast, the PAA is not relevant to whether plaintiffs have pled a <u>prima facie</u> case of fraudulent conveyance; it is relevant only to whether the shareholder defendants can make out the § 546(e) affirmative defense. <u>Id.</u>[10]

The leading case on the issue in the Second Circuit is <u>Chambers v. Time Warner</u>, 282 F.3d 147 (2d Cir. 2002). The <u>Chambers</u> court affirmed the district court's decision to consider written contracts between plaintiffs and defendants, because "[t]he Amended Complaint is replete with references to the contracts and requests judicial interpretation of their terms." <u>Id.</u> at 153 n.4. The <u>Chambers</u> court disapproved, however, of the district court's decision to consider certain unsigned

---

[10]    Relying on <u>Goldman v. Belden</u>, 754 F.2d 1059, 1066 (2d Cir. 1985), plaintiffs also argue that limited quotations of a document are not enough "to make the document integral to the complaint." <u>Id</u>. This argument, however, is meritless. <u>Goldman</u> discusses whether a particular document had been incorporated in a complaint, 754 F.2d at 1066, not whether it was integral to the complaint, which is a separate inquiry. Indeed, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." <u>Chambers</u>, 282 F.3d at 153.

codes laying out standard terms for contracts with members of
plaintiffs' union because "[t]he Amended Complaint does not
refer to the Codes, plaintiffs apparently did not rely on them
in drafting it, and none of the Codes submitted to the court
were signed by the [defendants]," and also because "the parties
disagree as to whether and how the Codes relate to or affect the
contractual relationships at issue." Id. at 154.

Here, the PAA lies somewhere between the contracts and the
unsigned codes at issue in Chambers. On the one hand, unlike in
Chambers, the Complaint here is not "replete" with references to
the PAA; instead, as mentioned above, the Complaint contains a
single reference to the PAA. But, on the other hand, unlike the
codes, no one here disputes whether or how the PAA relates to
the issues at the center of these motions. And plaintiffs
clearly relied on the PAA — even if only to get around it —
while drafting the Complaint. What is more, the reference to the
PAA, like the references to the contracts in Chambers, seems to
request judicial interpretation of its terms. The Complaint goes
out of its way to describe Wells Fargo as a "non-agent
contractor," a legal conclusion that is not entitled to the
assumption of truth. And "insofar as the Complaint relies on the
terms of [the Paying Agent Agreement], [the Court] need not
accept its description of those terms, but may look to the

agreement itself." Broder v. Cablevision Systems Corp., 418 F.3d 187, 198 (2d Cir. 2005).

What is more, the Tribune courts, faced with a similar set of allegations, deemed the paying agent agreement integral to the complaint. There, the Tribune shareholders submitted transaction documents, including the relevant paying agent agreement, in opposing the Tribune trustee's motion to amend their complaint to include a claim for constructive fraudulent conveyance. See In re Tribune Co. Fraudulent Conveyance Litig., No. 12-cv-2652 (S.D.N.Y.), Dkt. No. 6094, Ex. 11. The district court held that the complaint, "when read in combination with documents that are either judicially noticeable or are integral to the complaint, establish that [the paying agent] was acting as Tribune's agent." Tribune, 2019 WL 1771786, at *9-11. And, on appeal, the Second Circuit took note of the fact that the defendants had relied on the argument that certain "transaction documents" were integral to the complaint. Tribune, 946 F.3d at 77-78. Following Tribune, the Court holds that the PAA is integral to Complaint and can be considered at the motion to dismiss stage.

   B. Payments to the Shareholder Defendants

   Both the Litigation Trustee and the Indenture Trustee assert fraudulent conveyance claims against the public shareholders. The shareholder defendants move to dismiss those

claims on the ground that § 546(e) of the Bankruptcy Code safe harbors the public shareholder payments from the Litigation Trustee's claims and preempts the Indenture Trustee's claims.

In broad strokes, the purpose of that provision, as the Second Circuit recently observed, is to "promote finality and certainty for investors, by limiting the circumstances . . . under which securities transactions could be unwound," and thereby "enhancing the efficiency of securities markets" and reduc[ing] the cost of capital to the American economy." Tribune, 946 F.3d at 92. As explained below, the Court holds that plaintiffs' attempts to claw back payments made to the shareholder defendants in connection with an LBO that closed more than four years ago are foreclosed by § 546(e).

> i. Whether § 546(e) Safe Harbors the Payments From the Litigation Trustee's Fraudulent Conveyance Claims

> 1. General Legal Standard

Sections 544 through 553 of the Bankruptcy Code outline "the circumstances under which a trustee" may set aside "certain types of transfers and recapture the value of those avoided transfers for the benefit of the estate." Merit Management Group, LP v. FTI Consulting, Inc., 138 S.Ct. 883, 888 (2018). The Code also sets out "a number of limits on the exercises of these avoiding powers." Id. at 889. As relevant here, § 546(e) provides, in relevant part:

> Notwithstanding section 544 . . . of this title, the
> trustee may not avoid a transfer that is a . . .
> settlement payment . . . made by or to (or for the
> benefit of) a . . . financial institution . . . or
> that is a transfer made by or to (or for the benefit
> of) a . . . financial institution . . . in connection
> with a securities contract, . . . that is made before
> the commencement of the case, except under section
> 548(a)(1)(A) of this title.[11]

11 U.S.C. § 546(e). Put simply, the safe harbor applies where

two requirements are met: (1) there is a <u>qualifying</u> <u>transaction</u>

(i.e., there is a "settlement payment" or a "transfer payment .

. . made in connection with a securities contract) and (2) there

is a <u>qualifying participant</u> (i.e., the transfer was "made by or

to (or for the benefit of) a . . . financial institution").

## 2. <u>Qualifying Transaction</u>

The shareholder defendants argue that Nine West's payments

in connection with the common shares were qualifying

transactions for two independent reasons: (1) the payments were

"settlement payments" and (2) the payments were transfers "made

---

11      Section 546(e) applies to all fraudulent transfer claims,
except for intentional fraudulent transfer claims brought under
§ 548(a)(1)(A). Such claims may be brought only as to transfers
made within two years prior to the bankruptcy. <u>See</u> 11 U.S.C. §
548(a)(1)(A). Because the transfers at issue here occurred
nearly four years before Nine West filed for bankruptcy, Compl.
¶¶ 1, 7, the Litigation Trustee cannot and does not bring his
intentional fraudulent conveyance claims under Section
548(a)(1)(A). As a result, the shareholder defendants invoke the
§ 546(e) safe harbor against all of the Litigation Trustee's
fraudulent conveyance claims.

in connection with a securities contract." The Court agrees in both respects

a. <u>In Connection with a Securities Contract</u>

The Second Circuit has observed that the Bankruptcy Code defines "securities contract" with "extraordinary breadth" to include, <u>inter alia</u>, a "contract for the purchase or sale of a security, including any repurchase transaction on any such security," as well as "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph." <u>Tribune</u>, 946 F.3d at 81 (first quoting <u>In re Bernard L. Madoff Inv. Sec. LLC</u>, 773 F.3d 411, 417 (2d Cir. 2014) and then quoting 11 U.S.C. § 741(7)(A)(i), (vii)). In <u>Tribune</u>, the Second Circuit held that Tribune's payments for the redemption of shares from its public shareholders were "in connection with a securities contract." <u>Id.</u>

Here, just as in <u>Tribune</u>, the shareholder defendants argue, Nine West's payments to the public shareholders were for the redemption of shares and thus made in connection with a securities contract. Shareholder Defs' Mem. at 13.

Plaintiffs attempt to distinguish <u>Tribune</u>. They argue that, unlike in <u>Tribune</u>, the common shares were not "redeemed" by Nine West; instead, they were "cancelled and converted into the right to receive $15 per share in cash." Pls' Shareholder Mem. at 22

17

(quoting Complaint ¶ 132). After the closing, plaintiffs contend, "the former shareholders' stock certificates became nothing more than pieces of paper evidencing their respective rights to payment pursuant to the [Merger Agreement]." Id. And because the shares ceased to exist after the merger, the Merger Agreement did not — and, indeed, could not — involve their purchase. Id. at 22-23.

For two reasons, the Court rejects plaintiffs' argument and finds that the public shareholder transfers were made in connection with a securities contract. First, plaintiffs' attempt to distinguish Tribune is unsuccessful. Tribune involved a two-step LBO transaction: first, there was a tender offer, which involved the redemption of shares from public shareholders, and second there was, as here, a merger, which involved the cancelation and conversion of the remaining shares into the right to receive cash. See Declaration of Andrew G. Devore In Support of Reply Memorandum of Law in Further Support of Public Shareholder Defendants' Motion to Dismiss Under the Safe Harbor Act of 11. U.S.C. § 546(e), Dkt. No. 280-1. While the Second Circuit did not specifically discuss this distinction between redemption and cancellation, it had "no trouble concluding, based on Section 741(7)'s plain language, that all of the payments at issue, including those connected to the

redemption of shares, were 'in connection with a securities contract.'" <u>Tribune</u>, 946 F.3d at 81.

<u>Second</u>, as the shareholder defendants persuasively argue, § 741(7)(A)(vii) covers not only contracts for the repurchase of securities but also any other "similar" contract or agreement. As noted above, the Second Circuit has given this provision wide scope, observing that "few words in the English language are as expansive as 'any' and 'similar'" and defining "similar" to "mean[] 'having characteristics in common,' or 'alike in substance or essentials.'" <u>Madoff</u>, 773 F.3d at 419. There is no substantive or essential difference between an LBO that is effectuated through share redemption and one effectuated through share cancellation. Therefore, regardless of how the transaction is characterized, the Court finds that Nine West, at the least, entered into a transaction "similar" to a repurchase, and that the payments to the public shareholders in connection with the Merger Agreement fall within the catch-all of § 741(7)(A)(vii).[12]

---

[12] Plaintiffs further argue that the cancelation and conversion of shares is not similar to the redemption of shares (or to any other agreement or transaction listed in § 741) because the cancellation of shares does not involve "a security changing hands," something they deem to be a crucial element of any "transaction." Even if that were right (which the Court doubts), plaintiffs ignore that § 741(7)(A)(vii) covers not just transactions but agreements. If nothing else, the cancelation and conversion of shares constitutes an agreement that is sufficiently similar to a redemption of shares to fall within the statute's definition of a "securities contract."

b. Settlement Payment[13]

Under the Bankruptcy Code, a "settlement payment" means "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). The Second Circuit has held that a "settlement payment" includes a "transfer of cash made to complete a securities transaction." Enron Creditors Recovery v. Alfa, S.A.B. de C.V., 651 F.3d 329, 334-35 (2d Cir. 2011); see also In re Quebecor World (USA) Inc., 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011) ("[T]he direction given by the Enron majority with respect to that definition is both uncomplicated and crystal clear — a settlement payment, quite simply, is a transfer of cash made to complete a securities transaction.").

In light of the Second Circuit's capacious interpretation of § 741(8), the Court holds, in the alternative, that the payments made to the shareholder defendants were "settlement

---

[13]   Because the Tribune court found that the payments at issue were transfers in connection with a securities contract, it declined to reach whether those same payments would also "qualify as 'settlement payments' under Section 546(e)." 946 F.3d at 80 n.12.

payments" — that is, transfers of cash made to complete the merger.[14]

### 3. Qualifying Participant

After determining that the shareholder payments are qualifying transactions, the Court must next determine whether those transactions involved a qualifying participant — that is, whether the transfer was "made by or to (or for the benefit of) a . . . financial institution." § 546(e). Here, the shareholder defendants make two arguments: First, that Nine West counts as a qualifying participant and therefore all of the public shareholder payments are safe harbored by § 546(e); and second that certain public shareholders independently count as qualifying institutions either because they are registered under the Investment Company Act of 1940 or because they are themselves commercial banks. The Court again agrees with the shareholder defendants in both respects.

### a. Whether Nine West is Qualifying Participant

The shareholder defendants' primary argument is that Nine West qualifies as a "financial institution" under the relevant provisions of the Bankruptcy Code. As discussed above, § 546(e)

---

[14]   Plaintiffs do not address whether the payments were settlement payments in their briefs and did not take up the Court's invitation to address the issue at oral argument. Tr. at 34:16-22.

safe harbors qualifying transactions that are made by or to (or

for the benefit of) a . . . financial institution. Section

101(22) of the Bankruptcy Code, in turn, defines a "financial

institution" as, in relevant part:

> [A]n entity that is a commercial or savings bank . . .
> and, when any such . . . entity is acting as agent or
> custodian for a customer (whether or not a 'customer',
> as defined in section 741) in connection with a
> securities contract (as defined in section 741) such
> customer.

11 U.S.C. § 101(22)(A). In other words, when a bank is acting as

an agent for a customer in connection with a securities

contract, that customer counts as a "financial institution," for

the purposes of the § 546(e) safe harbor. In Tribune, the Second

Circuit announced and applied this interpretation of § 546(e)

for the first time. It held that Tribune was a financial

institution because, during that merger, Tribune was a

"customer" of Computershare, a bank, and that Computershare

acted as Tribune's "agent" in that merger by serving as its

paying agent to effectuate the redemption payments made to the

Tribune's former shareholders. 946 F.3d at 77-80.

The shareholder defendants argue that this case is on all

fours with Tribune. That is, Nine West qualifies as a financial

institution under § 101(22)(A) because, during the merger, Nine

West was a "customer" of Wells Fargo, a "commercial bank", and

that Wells Fargo acted as Nine West's "agent" in the merger by

serving as its paying agent to effectuate the payments to the shareholder defendants. Shareholder Defs' Mem. at 14. In response, plaintiffs dispute only whether Wells Fargo served as Nine West's "agent."

### i. Legal Standard for Agency

In finding that Computershare was Tribune's agent, the Second Circuit looked to common law, where the establishment of an agency relationship requires: (1) "the principal's manifestation of intent to grant authority to the agent"; (2) "agreement by the agent"; and (3) "the principal['s] . . . mainten[ance] [of] control over key aspects of the undertaking." Tribune, 946 F.3d at 79.

First, the Tribune court found that Tribune manifested its intent to grant authority to Computershare by "depositing the aggregate purchase price for the shares with Computershare and entrusting Computershare to pay the tendering shareholders." Id. at 80. Second, it found that Computershare "manifested its assent by accepting the funds and effectuating the transaction." Id. And finally, it found that Tribune maintained control over key aspects of the undertaking as the transaction proceeded. Id. Specifically on this last point, the Tribune court observed that Tribune had to give Computershare notice of its acceptance of the shares before Computershare was to pay the tendering shareholders. Id.

### ii. Whether Wells Fargo was Nine West's Agent

The shareholder defendants argue that here, as in Tribune, all three elements of agency are satisfied, for substantially the same reasons that the Tribune court relied on. Plaintiffs make two arguments in response: (1) that Wells Fargo was not an agent but merely a "non-agent service provider"; and (2) that, to the extent Wells Fargo was anyone's agent, it was Jasper Parent's agent, not Nine West's agent.[15]

#### 1. Whether Wells Fargo Was a "Non-agent Contractor"

Plaintiffs first argue, as they allege in the Complaint, that Wells Fargo was not an agent at all, but merely a "non-agent contractor." Pls' Shareholder Mem. at 17; Complaint ¶ 135. In essence, plaintiffs claim that Wells Fargo was not an agent because it did not have a fiduciary relationship with either Jasper Parent or Nine West. Pls' Shareholder Mem. at 18. Specifically, plaintiffs cite to two Second Circuit cases that, they contend, show that where a service provider is performing specified tasks in accordance with a contract, that contractual arrangement does not mean the service provider is an agent for its customer. Id. (citing, inter alia, Bridgestone/Firestone,

---

[15]   Plaintiffs also make the threshold argument that the Court should not consider the Paying Agent Agreement at the 12(b)(6) phase. For the reasons discussed above, the Court disagrees.

Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d. Cir. 1996)). Plaintiffs note that while Wells Fargo had specific contractual duties involving the holding and disbursing funds, maintaining records, and complying with specific directions, plaintiffs conclude, it "had no independence or decision-making authority," no "discretion as to whom it would pay or how much it would pay per share," and "no say over how to invest the money it held." Id. at 19-20.

But, as the shareholder defendants argue, plaintiffs are confusing cause and effect. A relationship of agency gives rise to a fiduciary relationship, see Tribune, 946 F.3d at 79; but a fiduciary relationship is not itself a necessary prerequisite to establishing agency. See Shareholder Reply at 7 (citing Restatement (Third) of Agency § 1.01 cmt. e). In any event, the shareholder defendants contend that plaintiffs' argument is foreclosed by Tribune, where the Second Circuit squarely held that a paying agent that had accepted the funds and effectuated the transaction was an agent of the customer. 946 F.3d at 80.

Plaintiffs attempt to circumvent Tribune by arguing that there are "significant differences between the facts in this case compared to Tribune." Pls' Shareholder Mem. at 21. As discussed below, however, while the factual wrinkles here might lead the Court to conclude that Wells Fargo was someone else's

agent, what is clear is that Wells Fargo, to at least some customer, was an agent.

### 2. Whether Wells Fargo was Only Jasper Parent's Agent

Plaintiffs next argue that the terms of the merger Agreement and the PAA make clear that, if Wells Fargo was anyone's agent, it was Jasper Parent's agent, not Nine West's agent. Here, unlike in Tribune, the LBO was effectuated by merging the target company (Nine West) and a shell company (Jasper Parent). As a result, the PAA was not a bilateral agreement between Nine West and Wells Fargo but a trilateral agreement between Nine West, Jasper Parent, and Wells Fargo. See PAA at 2. Plaintiffs contend that, even assuming the Court considers the PAA, that document makes clear that Wells Fargo was acting on behalf of, and subject to the control of, Jasper Parent, not Nine West. Pls' Shareholder Mem. at 11.[16]

Looking to Tribune, plaintiffs argue that in finding that Computershare was acting as Tribune's agent, the Second Circuit explained that: (1) Tribune had deposited the aggregate purchase

---

[16]   In support of this point, plaintiffs also cite to the Jones Group Proxy, which advised shareholders that Wells Fargo would pay them "on behalf of Parent." Pls' Shareholder Mem. at 11. Because the proxy statement is neither incorporated in nor integral to the Complaint, the Court declines to consider the document at the 12(b)(6) stage – nor would consideration of the document change the Court's analysis.

price with Computershare and (2) Computershare could not issue
payments until Tribune provided notice of its acceptance. Pls'
Shareholders Mem. at 11. Here, plaintiffs point out, it was
Jasper Parent, not Nine West, that was tasked with depositing
the funds and accepting the shares. See PAA § 1.4 ("Parent shall
deposit (or cause to be deposited) with the Paying Agent . . .
cash in immediately available funds . . . sufficient to pay the
Merger Consideration . . . ."); id. ("The Paying Agent agrees
that it will not release or pay any funds from the Payment Fund
to or for the account of any of the Shareholders . . .  unless
and until Parent has notified the Paying Agent that the
Effective Time of the Merger has occurred.").[17] In addition,
plaintiffs point out that, under the Merger Agreement, it was
Jasper Parent, not Nine West, that directed Wells Fargo how to
invest the funds until they are paid out. Merger Agreement §
4.2(a). By contrast, plaintiffs argue, Nine West's role in the
PAA ranged from "trivial" to "nonexistent." [18] Pls' Shareholder
Mem. at 13.

---

[17]   The shareholder defendants unsuccessfully attempt to elide
this point by using the name "Nine West" to refer collectively
to Jasper Parent and Nine West. See Shareholder Defs' Mem. at 6
n.8. As a result, every time the PAA mentions "Jasper Parent,"
the defendants swap in "Nine West."

[18]   Plaintiffs also argue that § 101(22)(A)'s analysis should
proceed transfer-by-transfer, rather than contract-by-contract.
And plaintiffs therefore conclude that to the extent Wells Fargo
was Nine West's agent, it was only so with respect to the

In response, the shareholder defendants argue that even if
Wells Fargo was an agent of Jasper Parent, Wells Fargo also
served as Nine West's agent for the purposes of distributing the
payments to the shareholder defendants. Shareholder Reply at 6.
In particular, the shareholder defendants point to the following
features of the PAA as evidence of agency relationship between
Nine West and Wells Fargo: (1) the PAA expressly provides that
Nine West "desires that the Paying Agent act as its special
agent for the purpose of distributing the Merger Consideration";
(2) Nine West was tasked with delivering to Wells Fargo a list
of the owners of common shares who were to receive payment; (3)
Nine West instructed and authorized Wells Fargo to cancel the
shares upon delivery; (4) Nine West was responsible for paying
Wells Fargo; (5) Nine West was responsible for indemnifying
Wells Fargo; and (6) upon completion of the merger, Wells Fargo
was instructed to deliver to Nine West "any and all funds which

---

transfers for the certificate securities not the book-entry
securities because to the extent Nine West exercised meaningful
control over the payments, it was only with respect to the
former. As discussed at greater length below, the Court rejects
plaintiffs' proffered interpretation of § 101(22)(A) and holds
that the analysis of whether a bank is an agent under the
statute must proceed contract-by-contract. Plaintiffs' attempt
to distinguish between the payments made in connection with the
book-entry securities and certificate securities, therefore, is
unavailing.

had been made available" to Wells Fargo. Shareholder Reply at 4-5.[19]

The Court agrees with the shareholder defendants and holds that Wells Fargo was Nine West's agent with respect to the Merger Agreement. Ultimately, the money belonged to Nine West and was paid to its shareholders. While plaintiffs try to use Jasper Parent's involvement to confuse the matter, the district court's analysis in Tribune ably resolves the issue: "[Wells Fargo] was entrusted with [millions] of dollars of [Nine West] cash and was tasked with making payments on [Nine West's] behalf to Shareholders upon the tender of their stock certificates to [Wells Fargo]. This is a paradigmatic principal-agent relationship." 2019 WL 1771786, at *11. While Nine West may have had less control over the shareholder transfers than did Tribune, it nevertheless had enough control over key elements of

---

[19]    The shareholder defendants also contend that plaintiffs' argument undermines plaintiffs' fraudulent conveyance claims, which requires that the transfer sought to be avoided have been made by the debtor-transferor – that is, by Nine West. Because plaintiffs purport to act on behalf of Nine West's (not Jasper Parent's) creditors, the shareholder defendants argue plaintiffs have no standing to seek to avoid transfers made by or on behalf of Jasper Parent. Shareholder Reply at 4-5. Ultimately, then, shareholder defendants conclude, one of two things must be true: Either Wells Fargo made the payments on behalf of Nine West, in which case the payments are safe harbored under § 546(e) or Wells Fargo made the payments only on behalf of Jasper Parent, in which case the transfers were not made by Nine West and are therefore not subject to avoidance. Id. It is unnecessary, however, for the Court to reach this argument.

the transaction so as to establish an agency relationship with Wells Fargo.

In sum, then, the Court holds that Nine West, in virtue of its relationship with Wells Fargo, is a financial institution under § 101(22)(A) and all of the payments made to the public shareholders pursuant to the Merger Agreement were settlement payments and/or transfers made in connection with a securities contract under § 546(e). Accordingly, the Court holds that all of the payments made to the public shareholders are safe harbored under § 546(e).

> b. Whether Certain Shareholder Defendants Independently Count as Qualifying Participants

In the alternative, the Court also finds that certain shareholder defendants independently count as qualifying participants, irrespective of Nine West's status. Section 101(22)(A) does not contain the statute's only definition of a "financial institution." Rather, § 101(22)(B) further defines "financial institution" to include "in connection with a securities contract . . . an investment company registered under the Investment Company Act of 1940." 11 U.S.C. 101(22)(B).

The shareholder defendants maintain, and submit SEC documents to prove,[20] that at least 82 of them are registered under the 1940 Act and therefore independently qualify as "financial institutions" under § 546(e).[21] In addition, one shareholder defendant – Natixis S.A. — is independently a financial institution because it is simply a "commercial bank," pursuant to 11 U.S.C. § 101(22). See Joinder and Supplement of Defendant Natixis S.A. to Public Shareholder Defendants' Motion to Dismiss Under the Safe Harbor of 11 U.S.C. § 546(e) ("Natixis Joinder"), Dkt. No. 243.[22] Because the payments to these

---

[20]   The Court can take judicial notice of the SEC filings establishing such status. See Paulsen v. Stifel, Nicolaus & Co., 2019 WL 2415213, at *6 (S.D.N.Y. Jun. 4, 2019).

[21]   While Plaintiffs do not dispute that public shareholders registered under the 1940 Act are qualifying participants, they do dispute whether one particular defendant – Gabelli Global Series Fund Inc. ("Gabelli") (originally sued as "Defendant NY-8") – has proffered any judicially noticeable evidence of its status as an investment company registered under the 1940 Act. See Joinder of Defendant NY-8 to Public Shareholder Defendants' Motion to Dismiss, Dkt. No. 149; Pls' Shareholder Mem. at 24 n.18. But Gabelli submitted the requisite documents along with its supplemental reply. See Supplemental Reply of Gabelli Global Series Fund Inc. In Further Support of Public Shareholder Defendants' Motion to Dismiss, Dkt. No. 282. Therefore, the Court holds that Gabelli independently qualifies as a financial institution.

[22]   As above, plaintiffs do not question whether commercial banks qualify as financial institutions under the statute but dispute whether Natixis has submitted judicially noticeable documentation of its status as such. Pls' Shareholder Mem. at 24 n.18. To establish its status as a commercial bank, Natixis submitted public documents, including: (1) an excerpt from the French Financial Agents Register; and (2) a copy of the

shareholders, which allegedly totaled over $338 million, were part of a qualifying transaction (for the reasons discussed above), they independently qualify for the § 546(e) safe harbor.

    ii. <u>Whether § 546(e) Preempts the Indenture Trustee's State Law Fraudulent Conveyance Claims Against the Shareholder Defendants</u>

   In addition to the Litigation Trustee's fraudulent conveyance claims brought under § 544 of the Bankruptcy Code, the Indenture Trustee asserts the same claims against the same defendants but without invoking § 544. In <u>Tribune</u>, however, the Second Circuit held that § 546(e) impliedly preempts state law fraudulent conveyance claims by individual creditors that would be barred by the safe harbor if brought by a bankruptcy trustee. 946 F.3d at 90-97. Because the Court holds that the § 546(e) safe harbor applies, the Court also holds that the Indenture

---

Natixis's amended articles of incorporation, with a certified English translation of the relevant portions. Natixis Joinder at 2; <u>see also</u> Declaration of Joseph Cioffi in Support of Joinder and Supplement of Defendant Natixis S.A. To Public Shareholder Defendants' Motion to Dismiss Under the Safe Harbor of 11 U.S.C. § 546(e), Dkt. No. 244. Plaintiffs contend that the Court should not take judicial notice of these documents because they are "foreign documents, whose accuracy is not apparent on their face." Pls' Shareholder Mem. at 24 n.18. But plaintiffs cite no authority for the proposition that courts cannot take judicial notice of publicly filed foreign documents with certified English translations. Indeed, courts in this district have taken judicial notice of such documents. <u>E.g.</u>, <u>In re Enron Corp.</u>, 323 B.R. 857, 869 (Bankr. S.D.N.Y. 2005). Therefore, the Court holds that Natixis independently qualifies as a financial institution.

Trustee's claims against the shareholder defendants are preempted by that provision.

        C. <u>Director and Officer Payments</u>

To the extent the D&O defendants received common shares as public shareholders, the foregoing analysis applies equally to them. In addition, the D&O defendants also move to dismiss plaintiffs' fraudulent conveyance claims and the Litigation Trustee's unjust enrichment claims as to payments made in connection with restricted shares, share equivalent units, and accumulated dividend payments.

        i. <u>Whether § 546(e) Safe Harbors the Payments From the Litigation Trustee's Fraudulent Conveyance Claims</u>

As discussed above, the § 546(e) safe harbor applies where two requirements are met: (1) there is a qualifying transaction; and (2) there is a qualifying participant.

        1. <u>Qualifying Transaction</u>

The D&O defendants argue that the payments for restricted shares, share equivalent units, and accumulated dividends all qualify as both (1) "settlement payments" and (2) transfers "in connection with a securities contract." Memorandum of Law in Support of Former Director and Officer Defendants' Motion to Dismiss Under the Section 546(e) Securities Safe Harbor ("D&O Defs' Mem."), Dkt. No. 94, at 8; Reply Memorandum of Law of Former Director and Officer Defendants in Support of Their

Motion to Dismiss the Complaint ("D&O Reply"), Dkt. No. 281, at 6. Plaintiffs concede that, if the Court finds that the payments for the common shares count as qualifying transactions, then so must the payments for restricted shares and share equivalent units. Pls' D&O Mem. at 10. But plaintiffs contend that the accumulated dividend payments still should not count as qualifying transactions because they did not involve the purchase, sale, loan, or even cancellation of any security. Id. The only question for the Court to resolve here, thus, is whether the accumulated dividend payments count as qualifying transactions.

As discussed above, the Second Circuit construes broadly both "settlement payments" and "transfers in connection with a securities contract." The D&O defendants make two arguments for why the accumulated dividend payments should count as qualifying transactions.

First, the D&O defendants contend that the Complaint itself concedes that accumulated dividends were transfers "made from the cancellation of Jones Group shares in connection with the LBO." D&O Defs' Mem. at 7 (quoting Compl. ¶ 40). But the D&O defendants are taking the Complaint out of context. In full, that sentence reads: "First, all the Directors and Officers knew that they would receive, individually or through family members, affiliated entities, or trusts, material amounts from the

34

cancellation of Jones Group shares in connection with the LBO."
Compl. ¶ 40. That sentence could just as well refer to the money
the directors and officers would receive in connection with the
restricted share and share equivalent units. The Court therefore
rejects this first argument.

Second, the D&O defendants point out that other courts have
held that dividend payments made as part of an integrated
transaction where the shareholder gives up her equity count as
qualifying transactions. On point here is In re Boston
Generating, -- B.R. --, 2020 WL 3286207, at *38 (S.D.N.Y. June
18, 2020). In that case, the court held that dividend payments
may count as "settlement payments" when they are made in
exchange for the holder's equity interest. Specifically, the
court homed in on the fact that the dividend payments were made
"as part of an integrated transaction . . . that comprised the
use of more than $1 billion to redeem equity interests in [the
target company], redeem warrants, and pay a dividend to
equity."[23] Id. By contrast, where a dividend is paid in the
ordinary course to shareholders who retain their equity

---

[23]    For similar reasons, the court concluded that the dividend
payments also counted as "transfers made in connection with a
securities contract." In re Boston Generating, 2020 WL 3286207,
at *38.

following the dividend, such payments are not "settlement payments." Id.

While In re Boston Generating is not precedent binding on this Court, the Court finds its reasoning persuasive, especially in light of the wide berth that the Second Circuit has afforded the "qualifying transaction" prong of the analysis. Here, as in In re Boston Generating, the accumulated dividend payments were tied to the restricted shares and paid as part of the settlement of the Merger Agreement. See Merger Agreement § 4.3 (holders of restricted shares shall receive "an amount in cash, for each Restricted Share, equal to the Per Share Merger Consideration plus any unpaid dividends that have accumulated on such Restricted Share . . . ."). All of the cases on which plaintiffs rely are cases in which dividend payments were made for securities that the transferees continued to hold, exactly the sort of situation that is distinguished in In re Boston Generating. See Pls' D&O Mem. at 11. Accordingly, the Court holds that the accumulated dividend payments were both settlement payments and transfers made in connection with a securities contract.

## 2. Qualifying Participant

To satisfy the "qualifying participant" prong of the analysis, the D&O defendants argue that Nine West should be considered a "financial institution" with respect to all

payments made in connection with the Merger Agreement, even those payments with respect to which Wells Fargo played no role.

As discussed above, the Court holds that Nine West qualifies as a financial institution under § 101(22)(A) because, during the merger, it was a customer of Wells Fargo, which acted as its agent in that merger by serving as its paying agent to effectuate the payments to the public shareholders. Unlike the common share payments, however, which were effectuated through Wells Fargo, plaintiffs allege that the payments for restricted shares, share equivalent units, and accumulated dividends "were processed through the payroll and by other means." Compl. ¶ 135. The question here, then, is whether Nine West's status as a "financial institution" extends to these other payments, which were made in connection with the merger, but that weren't themselves processed by Wells Fargo.

At bottom, this is a question of statutory interpretation. As quoted above, § 101(22)(A) defines a financial institution as, in relevant part:

> [A]n entity that is a commercial or savings bank . . . and, when any such . . . entity is acting as agent or custodian for a customer (whether or not a 'customer', as defined in section 741) in connection with a securities contract (as defined in section 741) such customer.

Ultimately, the parties disagree over "when" Wells Fargo is acting as Nine West's agent in connection with a securities

contract. Advocating for a "contract-by-contract" approach, the D&O defendants argue that a customer of a bank is a "financial institution" under § 101(22)(A) with respect to a securities contract. Accordingly, once the Court finds that Nine West is a "financial institution" as a customer of Wells Fargo in connection with the Merger Agreement, § 546(e) protects all "settlement payments" or transfers "in connection with" the Merger Agreement made "by or to (or for the benefit of)" Nine West, regardless whether Wells Fargo itself processed or otherwise served as an agent with respect to these payments. D&O Reply at 4.

Plaintiffs offer an alternative reading. Taking a "transfer-by-transfer" approach, plaintiffs argue that a customer of a bank is a "financial institution" under § 101(22)(A) with respect to particular transfers. On this reading, even if Wells Fargo served as Nine West's agent in connection with the Merger Agreement, § 546(e) protects only those payments with respect to which Wells Fargo played an agency role. Pls' D&O Mem. at 8-9. Where, as here, certain payments made in connection with the securities contract were not processed by the paying agent, those payments are not safe harbored. In support of their position, plaintiffs stress that, under the statute, a customer of a bank only counts as a financial institution "when [a bank] is acting as agent." Id. at

38

8. Thus, "customer status as a financial institution is . . . transitory and transactional in nature and exists only when and to the extent the bank is playing an agency role with respect to a specific transfer." Id. 8-9.

For two reasons, the Court adopts the "contract-by-contract" interpretation of § 101(22)(A). First, the reading is more consistent with the text of the statute. The statute provides that a customer of a bank qualifies as a financial institution "when [the bank] is acting as agent . . . in connection with a securities contract." If plaintiffs' reading were right, the statute should have read: "when [the bank] is acting as agent . . . in connection with a transfer." Indeed, § 101(22)(A), which simply defines the term "financial institution," does not even mention the word "transfer."

Second, plaintiffs' proposed reading runs into tension with the Supreme Court's decision in Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 892 n.6 (2018). In that case, the Supreme Court held that "the relevant transfer for purposes of the § 546(e) safe-harbor inquiry is the overarching transfer that the trustee seeks to avoid," and "not any component part of that transfer." Id. at 893. In so holding, the Court rejected an interpretation that some lower courts had given to § 546(e) that "transfers in which financial institutions served as mere conduits" are safe harbored, just because the money passed

39

through a financial institution. Id. at 892. But plaintiffs'
reading effectively asks the Court to revive a version of that
conduit theory, affording safe harbor only where "the bank is
playing an agency role with respect to a specific transfer."
Pls' D&O Mem. at 9. In light of Merit, such a narrow focus on
the mechanics of each individual transfer is misplaced.

In sum, then, the Court holds that the relevant inquiry
under Tribune and in light of Merit is not whether the bank had
a role in a specific payment or transfer but whether that bank
was acting as an agent in connection with a securities contract.
When, as here, a bank is acting as an agent in connection with a
securities contract, the customer qualifies as a financial
institution with respect to that contract, and all payments made
in connection with that contract are therefore safe harbored
under § 546(e). For that reason, the payments made to the D&O
defendants - viz., payments in connection with restricted
shares, share equivalent units, and accumulated dividends - are
safe harbored under § 546(e), even if, as plaintiffs allege,
they were not themselves processed by Wells Fargo.

ii. Whether § 546(e) Preempts the Indenture Trustee's
State Law Fraudulent Conveyance Claims Against
the D&O Defendants

As explained above, because the Court holds that the §
546(e) safe harbor applies to the payments made in connection
with the restricted shares, share equivalent units, and

40

accumulated dividends, the Court also holds that the Indenture Trustee's fraudulent conveyance claims against the D&O defendants are preempted by that provision.

> iii.  Whether § 546(e) preempts the Litigation
>       Trustee's Unjust Enrichment Claims Against the
>       D&O Defendants[24]

Finally, the D&O defendants argue that the Litigation Trustee's unjust enrichment claims against certain former directors and officers are preempted by § 546(e)'s safe harbor. Here, the Litigation Trustee is seeking "disgorgement and restitution of, and a judgment against [certain defendants] in the amount of, the payments, benefits, incentives, and other things of value [those defendants] received in connection with the 2014 Transaction." Compl. § 191.

Where an unjust enrichment claim "seeks to recover the same payments held unavoidable under § 546(e)," it would "render the § 546(e) exemption meaningless, and would wholly frustrate the purpose behind that section." AP Servs. LLP v. Silva, 483 B.R. 63, 71 & n.64 (S.D.N.Y. 2012). The D&O defendants argue that

---

[24]   The Litigation Trustee brings the unjust enrichment claims only against the former directors and officers who are alleged to have played "a key role in advocating for and/or approving the Merger," namely: Kimmel, Demsey, Kamens, Mitarotonda, Nuechterlein, Robinson, and Donnalley, see 20-cv-4287, Dkt. No. 130; McClain, Crotty, and Fersko, see 20-cv-4262, Dkt. No. 110 Cade and Dansky, see 20-cv-4265, Dkt. No. 53; Georgiadis, see 20-cv-4292, Dkt. No. 1; Card and Wilkins, see 20-cv-4346, Dkt. No. 1; and Dickson and Mettler, 20-cv-4436, Dkt. No. 134.

because the Litigation Trustee is seeking to recoup money that these defendants received in connection with transfers that have been safe harbored, those claims are preempted by § 546(e).

In response, the Litigation Trustee argues that the D&O defendants are misframing the doctrine: unjust enrichment claims are only preempted where they are "substantially identical" to the avoidance claims barred by § 546(e). Pls' D&O Mem. at 13 (quoting In re Contemporary Indus Corp., No. A99-8135, 2007 WL 5256918, at *5 (Bankr. D. Neb. June 29, 2007), aff'd, No. 8:07CV288, 2008 WL 11450766 (D. Neb. Jan. 8, 2008), aff'd, 564 F.3d 981 (8th Cir. 2009), abrogated in part by Merit Mgmt. Grp., LP v. FTI Consulting, Inc., 138 S. Ct. 883, 892 n.6 (2018). Here, the Litigation Trustee argues, the unjust enrichment claims "are based not on the allegations that [Nine West] engaged in intentional and constructive fraudulent conveyance, but on the allegations that the former directors and officers of Jones Group breached their fiduciary duties and engaged in other personal wrongdoing." Id. at 12-13. In other words, because the unjust enrichment claims sound in breach of fiduciary duty, not fraudulent conveyance, the Litigation Trustee insists they are not preempted by § 546(e).

But, as the D&O defendants persuasively respond, it is the remedy sought, rather than the allegations pled, that determines whether § 546(e) preempts a state law claim. See, e.g.,

42

Contemporary Industries Corp. v. Frost, 564 F.3d 981, 988 (8th Cir. 2009) (Beam, J.) abrogated on other grounds by Merit, 138 S.Ct. 883 (2018). This rule also promotes the purpose of § 546(e), which is to "to limit[] the circumstances . . . under which securities transactions could be unwound." Tribune, 946 F.3d at 92.

Therefore, because the Court holds that the payments made in connection with the restricted shares, share equivalent units, and accumulated dividends are safe harbored under § 546(e), the Court likewise dismisses the Litigation Trustee's unjust enrichment claims as to those payments. The Court notes, however, that the unjust enrichment claims are not dismissed with respect to the change in control payments, which, as discussed above, the D&O defendants have not yet moved to dismiss.

\* \* \* \* \*

For the foregoing reasons, the Court hereby dismisses all fraudulent conveyance and unjust enrichment claims with respect to payments made in connection with common shares, restricted shares, share equivalent units, and accumulated dividends.[25] The

---

[25] In particular, the Court dismisses the following claims in their entirety: Counts V and VI in the amended complaint in 20-cv-4262, Dkt. No. 110; Counts IV and V in the amended complaint in 20-cv-4265, Dkt. No. 53; Counts I and II in the amended complaint in 20-cv-4267, Dkt. No. 45; Counts I and II in the complaint in 20-cv-4286, Dkt. No. 1; Counts V and VI in the

Clerk of the Court is directed to close docket entries 88 and 93 in 20-md-2941. In addition, because all of the claims in the complaints in the following actions have now been dismissed, the Clerk is to enter judgment in favor of defendants in 20-cv-4286, 20-cv-4289, 20-cv-4299, 20-cv-4434, 20-cv-4440, 20-cv-4479, and 20-cv-4480.


      SO ORDERED.

Dated:    New York, NY
        August 27, 2020

                                  JED S. RAKOFF, U.S.D.J.

---

amended complaint in 20-cv-4287, Dkt. No. 130; Counts I and II in the complaint in 20-cv-4289, Dkt. No. 1; Counts IV, V, and VI in the complaint in 20-cv-4292, Dkt. No. 1; Counts I and II in the complaint in 20-cv-4299, Dkt. No. 1; Counts I and II in the complaint in 20-cv-4335, Dkt. No. 1; Counts V and VI in the complaint in 20-cv-4346, Dkt. No. 1; Counts I and II in the amended complaint in 20-cv-4433, Dkt. No. 100; Counts I and II in the complaint in 20-cv-4434, Dkt. No. 4; Counts V and VI in the amended complaint in 20-cv-4436, Dkt. No. 134; Counts I and II in the complaint in 20-cv-4440, Dkt. No. 1; Counts I and II in the complaint in 20-cv-4479, Dkt. No. 1; Counts I and II in the complaint in 20-cv-4480, Dkt. No. 1; and Counts I and II in the amended complaint in 20-cv-4569, Dkt. No. 112.

The Court also dismisses the following unjust enrichment claims only with respect to the payments made in connection with common shares, restricted shares, share equivalent units, and accumulated dividends, but not with respect to the change in control payments: Count IV in the amended complaint in 20-cv-4262; Count III in the amended complaint in 20-cv-4265; Count IV in the amended complaint in 20-cv-4287; Count IV in the complaint in 20-cv-4346; and Count IV in the amended complaint in 20-cv-4436.