UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
:
IN RE: NINE WEST LBO SECURITIES      :
LITIGATION                           :
:                    20 MD. 2941 (JSR)
Pertains to All Associated Actions   :
:                    OPINION AND ORDER
:
------------------------------------x

JED S. RAKOFF, U.S.D.J.

Familiarity with the general background to this case is here assumed. In re Nine West LBO Sec. Litig., --- F. Supp. 3d ---, 2020 WL 5049621 (S.D.N.Y. Aug. 27, 2020). As relevant here, plaintiffs -- consisting of Marc Kirschner, as trustee for the Nine West Litigation Trust representing unsecured creditors (the "Litigation Trustee"), and Wilmington Savings Fund Society, FSB, as successor indenture trustee for various notes issued by Nine West (the "Indenture Trustee") -- brought these consolidated actions against former officers, directors, and shareholders of the fashion retail company The Jones Group, Inc. ("Jones Group" or "Company"), claiming breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent conveyance, unjust enrichment, and violations of 15 Pa. Cons. Stat. §§ 1551 and 1553, arising out of the bankrupting, and bankruptcy, of the Company in connection with a 2014 leveraged buyout (the "2014 Transaction").

On August 27, 2020, the Court dismissed the fraudulent conveyance and unjust enrichment claims with respect to payments made in connection with certain shareholder transfers that were made as part of the 2014 Transaction. Dkt. No. 317. Thereafter, the director defendants and the officer defendants brought a second set of motions to dismiss plaintiffs' remaining claims. Dkt. Nos. 322 & 325. By bottom line Order dated November 3, 2020, the Court granted in part and denied in part those motions. Dkt. No. 381. This Opinion and Order provides the reasons for that ruling.

I.   Background[1]

A. The 2014 Transaction

Before 2014, Jones Group was a publicly traded global footwear and apparel company, selling brands such as Nine West, Anne Klein, and Gloria Vanderbilt to retailers across the country like Macy's, Lord & Taylor, and Walmart/Sam's Club. Compl. ¶ 45. In the years leading up to 2014, Jones Group struggled: revenue was flat, target earnings were missed, and store counts were down. Id. ¶ 46. One bright spot, however, was the performance of its Stuart Weitzman and Kurt Geiger brands, which had "increased in value since they

---

[1]   Unless otherwise noted, all citations to the complaints are to the First Amended Complaint in Kirschner v. Kimmel, No. 20-cv-4287 (S.D.N.Y.), Dkt. No. 130. Each cited allegation is found in each of the other ten operative complaints. For the purposes of the instant motion, the well-pleaded allegations in the complaints are assumed to be true

were purchased between 2010 and 2012" and were "substantially exceeding" projections. Id. ¶¶ 86, 114.

In July 2012, the Board began to consider selling all or part of the Company. Id. ¶¶ 48-53. The Board retained Citigroup Global Markets ("Citigroup"), an investment bank, to serve as its advisor. Id. ¶ 48. Among other things, Citigroup advised the Board that, in the context of a transaction where Jones Group retained all of its businesses -- including the Stuart Weitzman and Kurt Geiger brands -- the Company could support a debt to EBITDA ratio of 5.1 times its estimated 2013 EBITDA. Id. ¶ 107.

Around April 2013, the private equity firm Sycamore Partners Management, L.P. ("Sycamore") expressed interest in transacting an arrangement with Jones Group, and, after some negotiation, offered to buy Jones Group for $15 per share, reflecting an implied enterprise value of $2.15 billion. Id. ¶¶ 52-58. The Merger Agreement involved five integrated components that would "occur substantially concurrently." Id. ¶ 61.

1. The Merger. Jones Group would merge with a Sycamore affiliate, and, as the surviving corporation, be renamed Nine West Holdings, Inc. ("Nine West"). Id.

2. The Sponsor Equity. Sycamore (along with another private equity firm) would contribute at least $395 million in equity to Nine West. Id.

3. <u>The Additional Debt</u>. Nine West would increase its debt from $1 billion to $1.2 billion. <u>Id.</u>

4. <u>The Shareholder Transfers</u>. The Jones Group shareholders would be cashed out at $15 per share, for a total of approximately $1.2 billion. <u>Id.</u>

5. <u>The Carve-Out Transactions</u>. The Stuart Weitzman and Kurt Geiger brands, along with another business unit, Jones Apparel (collectively, the "Carve-Out Businesses"), would be sold to other Sycamore affiliates for substantially less than their fair market value. <u>Id.</u>

The Merger Agreement also contained a "fiduciary out" clause, which allowed the directors to withdraw their recommendation in favor of the 2014 Transaction if they determined, "after consultation with counsel, that withdrawal 'could be required by the directors' fiduciary duties under applicable law." <u>Id.</u> ¶ 110.

On December 19, 2013, the Board unanimously voted to approve the Merger Agreement. <u>Id.</u> ¶ 65. While the Board's approval purported to exclude the Additional Debt and the Carve-Out Transactions, the Merger Agreement included provisions that obligated the Company to assist Sycamore in planning the Carve-Out Transactions and in syndicating the Additional Debt. <u>Id.</u> ¶¶ 66-70. To that end, many officers participated in rating agency presentations and prepared offering memoranda for the Additional Debt. <u>Id.</u> ¶ 65.

Before the closing, Sycamore made changes to the deal terms. Sycamore reduced its equity contribution from $395 million to $120 million and correspondingly arranged for additional new debt that would increase Nine West's total debt from $1.2 billion to $1.55 billion. Id. ¶¶ 103-06. This new structure meant that the Company's debt would be 7.8 times the Adjusted EBITDA calculated by the Company's management and 6.6 times the Adjusted EBITDA figure produced by Sycamore -- both higher than the 5.1 multiple that Citigroup had advised the Board that the Company could sustain in a scenario where it retained all its businesses. Id. ¶ 108.

Because the Merger Agreement contemplated that Sycamore would sell off the Carve-Out Businesses to other Sycamore affiliates, Sycamore retained Duff & Phelps to render a solvency opinion as to "RemainCo" -- that is, the Nine West businesses that would remain following the Carve-Out Transactions. Id. 84. Sycamore created "unreasonable and unjustified" EBIDTA projections for RemainCo, and instructed Duff & Phelps to use those numbers for its analysis. Id. ¶¶ 84-86. Sycamore did so, according to plaintiffs, because the more value that was attributed to RemainCo, the easier it would be to justify a low purchase price for the Carve-Out Businesses. Id. ¶ 71. Eventually, Sycamore settled on a $1.58 billion valuation of RemainCo - a number just above the $1.55 billion in debt that RemainCo would take on. Id. ¶¶ 71, 75. While the officers and directors were not directly aware that Sycamore had "manipulated"

the projections of RemainCo, they "received updated reports and projections from Jones Group management on a monthly basis and were therefore aware of the decline in actual and projected performance of the businesses that would comprise RemainCo, and the glowing projections for the performance of the crown jewels that would be sold to Sycamore affiliates." Id. ¶ 95.

The Merger closed on April 8, 2014. Id. ¶ 4. Upon the Merger's closing, Sycamore's principals, Stefan Kaluzny and Peter Morrow, became the sole directors Nine West. Id. ¶ 43. As part of the closing, Kaluzny and Morrow caused Nine West to sell the Carve-Out Businesses to newly formed Sycamore affiliates for $641 million, a price substantially below their fair market value of at least $1 billion, id. ¶ 136, and even below the $800 million that Jones Group had paid to acquire the fast-growing companies a few years earlier. After the Merger closed and upon the termination of their employment, most of the officers and certain employees received "change in control" payments in amounts ranging from $425,000 to $3 million. Id. ¶¶ 39–40.

B. 2014 Litigation

In early 2014, after the announcement of the 2014 Transaction but before the closing, several stockholders filed suit in New York state court against Jones Group, its directors and officers, and Sycamore, among others. See In re The Jones Group Inc. S'holders Litig., No. 650096/2014 (N.Y. Sup.Ct. Mar. 7, 2014). The

complaint asserted direct and derivative claims against the directors. Dkt. No. 327-2 (the "2014 Complaint"), ¶¶ 1, 43. Specifically, the shareholder plaintiffs alleged that the directors breached their fiduciary duties to the Company in connection with the process leading up to their decision to sell the Company to Sycamore, resulting in the "inadequate consideration of $15 per share." Id. ¶¶ 1, 11.

As part of the putative derivative claim, certain plaintiffs made a demand on the Company, as required by Pennsylvania law. Id. ¶ 44. In response, the Board formed a special litigation committee (the "SLC") to investigate the claims. See Stipulation of Settlement, Dkt. No. 327-3, at 3. The investigation focused on the events leading up the signing of the Merger Agreement in December 2013. Report of the Special Litigation Committee, Dkt. No. 327-1, Table of Contents.[2] The SLC found "that the Board has acted on an informed basis in good faith and in the best interests of [Jones Group] in agreeing to the merger agreement with Sycamore," that it "was focused at all times on maximizing return for shareholders" and that the Company "should not pursue the shareholder claims against the Board because they lack merit." Id. at 3-4, 118.

---

[2]    An SLC report is properly considered in connection with a motion to dismiss. See, e.g., In re H.J. Heinz Co. Deriv. & Class Action Litig., No. G.D. 13-003108, 2013 WL 1905075, at *3 (Pa. Com. Pl. Apr. 29, 2013). In any event, plaintiffs, who themselves cite to the SLC report in their papers, make no objection to the Court's consideration of it.

The plaintiffs and the defendants thereafter entered into a Stipulation of Settlement. Dkt. No. 327-3.[3] As a part of the settlement, the "Releasing Persons" agreed that they would be barred from suing any "Released Person" for "any Settled Claims and from commencing, prosecuting or participating in the commencement or prosecution of any Settled Claims in any other action, suit, or proceeding." Stipulation and Settlement at 16. "Releasing Persons" was defined as "Plaintiffs and all members of the Class." Id. at (A)(1)(r). "Plaintiffs," in turn, was defined as "individually and collectively," the six named plaintiffs in the action"; and the "Class" was defined to exclude "Defendants." Id. at (A)(1)(b), (o). "Released Persons" was defined to include the Company, and its officers and directors. Id. (A)(1)(q), (f). "Settled Claims" was defined to include any action brought:

> by or on behalf of Plaintiffs or any member of the Class,
> whether individual, direct, class, derivative,
> representative, legal, equitable, or of any other type,
> in their capacity as shareholders during any time
> between December 19, 2013, and April 8, 2014, against
> any or all of the Released Persons, . . . , which have
> arisen, could have arisen, arise now or hereafter arise
> out of, or relate in any manner to . . . the Merger

---

[3]    "Settlement agreements are documents of which a court may take judicial notice in order to determine whether future claims are barred by a previous settlement." Deylii v. Novartis Pharmaceuticals Corp., No. 13-cv-06669 (NSR), 2014 WL 2757470, at *4 (S.D.N.Y. Jun. 16, 2014). Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

> Agreement   and   the   transactions   contemplated
> thereby . . . .

Id. (A)(1)(t). Finally, both the Releasing and Released Persons "waive[d] [their] rights to the extent permitted by state law, federal law, foreign law or principle of common law, which may have the effect of limiting the release set forth above." Id. at 3.

On February 25, 2015, a New York state court approved the Stipulation and dismissed the Settled Claims on the merits and with prejudice. Dkt. No. 327-4.

### C. The Bankruptcy

In April 2018, roughly four years after the Merger closed, Nine West filed for bankruptcy. Compl. ¶ 147. The bankruptcy court approved Nine West's Chapter 11 plan in February 2019. Id. ¶¶ 13-17. As part of the bankruptcy plan, Nine West settled its claims against Sycamore. Id. ¶ 151. Nine West did not, however, settle its claims against the former directors and officers of Jones Group. Id. To that end, the bankruptcy plan established a Litigation Trust, which authorized plaintiff Marc Kirschner, as Litigation Trustee, to pursue "all claims and Causes of Action arising under state or federal law owned by, or asserted by or on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates, in respect of matters arising out of or relating to the 2014 Transaction against, [inter alia], directors,

officers, or managers of Jones Group and its subsidiaries and affiliates." <u>In re Nine West Holdings, Inc. et al</u>. at 28 (C.A. No. 18-10947 (SCC)) (Bankr. S.D.N.Y.) (Feb. 27, 2019), Dkt. 1308. The proceeds from the Litigation Trust are to be distributed to certain creditors of the Company.

The bankruptcy plan also authorized plaintiff Wilmington Savings Fund Society, FSB, as Indenture Trustee for certain noteholders of Nine West, to pursue avoidance claims "solely to the extent necessary to pursue such claims against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction." Compl. ¶ 16.

D. <u>Procedural History</u>

Between February and June 2020, the Litigation Trustee and the Indenture Trustee brought these now-consolidated complaints against the former officers, directors, and shareholders of Jones Group, claiming breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, fraudulent conveyance, unjust enrichment, and violations of 15 Pa. Cons. Stat. §§ 1551 and 1553, arising out of the bankrupting, and bankruptcy, of the Company in connection with the 2014 Transaction.[4] On August 27, 2020, the

---

[4]    Plaintiffs initially filed these complaints in judicial districts across the country. On June 2, 2020, the United States Judicial Panel on Multidistrict Litigation transferred the actions

Court dismissed all fraudulent conveyance and unjust enrichment claims with respect to payments made in connection with the Shareholder Transfers, holding that all such transactions were safe harbored under § 546(e) of the Bankruptcy Code, which also preempted state-law unjust enrichment claims. See In re Nine West LBO Sec. Litig., 2020 WL 5049621, at *15.

Now before the Court are two motions to dismiss plaintiffs' remaining claims. First, the director defendants[5] move to dismiss the Litigation Trustee's claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and violations of 15 Pa. Cons. Stat. §§ 1551 and 1553.[6] Dkt. No. 325. Second, the officer defendants[7] move to dismiss: (1) the Litigation Trustee's claims

---

to the undersigned for consolidated pretrial proceedings. In re Nine West LBO Secs. Litig., 464 F. Supp. 3d 1383 (J.P.M.L. 2020).

[5]   The director defendants are Gerald C. Crotty, Robert L. Mettler, Mary Margaret Hastings Georgiadis, Ann Marie C. Wilkins, Sidney Kimmel, John D. Demsey, Matthew H. Kamens, James A. Mitarotonda, Jeffrey D. Nuechterlein, Lowell W. Robinson, Robert & Susan Mettler Family Trust U/A 3/27/06, Robert L. Mettler, Susan T. Mettler, Trustees, Telendos, LLC, and The Sidney Kimmel Revocable Indenture of Trust. This group also includes Wesley R. Card, who served as both an officer and director.

[6]   The Litigation Trustee does not oppose the directors' motion to dismiss the claims under 15 Pa. Cons. Stat. §§ 1551 and 1553. See Litigation Trustee's Memorandum of Law in Opposition to Former Non-Management Directors' Motion to Dismiss, ("Pl. Dir. Mem."), Dkt. No. 145, at 2 n.1. Accordingly, those claims are hereby dismissed.

[7]   The officer defendants are Christopher R. Cade, Wesley R. Card, Ira M. Dansky, Joseph T. Donnalley, Richard L. Dickson,

for breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, and unjust enrichment;[8] and, along with certain other defendants who joined in this motion,[9] (2) the Litigation Trustee's and the Indenture Trustee's fraudulent conveyance claims in connection with the change in control payments. Dkt. No. 322.

## II.  Discussion

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal,

---

Cynthia DiPietrantonio, Tami Fersko, John T. McClain, and Aida Tejero-DeColli.

[8]    While the Court previously dismissed the Litigation Trustee's unjust enrichment claims with respect to payments made in connection with shareholder transfers, see In re Nine West LBO Sec. Litig., 2020 WL 5049621, at *15 n.25, the officer defendants now move to dismiss the unjust enrichment claims with respect to the change in control payments, see Memorandum of Law in Support of Former Officer Defendants' Motion to Dismiss ("Officer Mem."), Dkt. No. 323, at 16-19. The Litigation Trustee does not oppose the officer defendants' motion to dismiss these claims. Plaintiffs' Memorandum of Law in Opposition to Former Officer Defendants' Motion to Dismiss ("Pl. Off. Mem."), Dkt. No. 356, at 5 n.2. Accordingly, these claims are hereby dismissed.

[9]    Defendant Janet Carr joins in the officer defendants' motion to dismiss the fraudulent conveyance claims. See Notice of Joinder and Statement of Defendant Janet Carr in Support of Former Officer Defendants' Motion to Dismiss ("Carr Joinder"), Dkt. No. 328. In addition, certain employee defendants who also allegedly received change in control payments -- namely, Jeffrey Brisman, Lynne Bernstock, Scott Bowman, Gregory Clark, John Deem, Beth B. Dorfsman, Arundhati Kulkarni, Joseph Rosato, Larissa Sygida, and Norman Veit -- join in the motion to dismiss the fraudulent conveyance claims. See Joinder of the Former Employee Defendants to the Motions to Dismiss of (A) the Former Officer Defendants, and of (B) the Former Non-Management Directors ("Empl. Joinder"), Dkt. No. 332.

556 U.S. 662, 678 (2009). The Court "accept[s] all factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

There are four sets of arguments before the Court. First, all moving defendants argue that the 2014 Litigation, for one reason or another, bars plaintiffs' various claims. Second, the director defendants argue that Litigation Trustee's fiduciary duty and aiding and abetting claims fail. Third, the officer defendants argue that the Litigation Trustee's fiduciary duty and aiding and abetting claims fail. Finally, the officer defendants, joined by certain employee defendants, argue that the fraudulent conveyance claims fail. The Court addresses each argument in turn.

A. Whether the 2014 Litigation Bars Any of the Claims

Before addressing the merits, defendants argue that (at least some of) the remaining claims are barred by the 2014 Settlement, the doctrine of res judicata, and the SLC process.

i. Whether the 2014 Settlement Bars these Claims

As mentioned above, the 2014 Settlement bars the "Releasing Persons" -- namely, the named plaintiffs in that action and the class -- from bringing claims arising out of or relating to the 2014 Transaction against the "Released Persons," which includes the directors and officers. Courts interpret a settlement release under traditional contract principles and must dismiss claims that

13

are "precluded by the plain language of the release." In re WorldCom, Inc., 296 B.R. 115, 120-21 (Bankr. S.D.N.Y. 2003).

Defendants argue that the 2014 Settlement bars the Litigation Trustee's fiduciary duty claims. They reason as follows: because the shareholder plaintiffs, who sought to bring derivative claims on behalf of the Company, were "Releasing Persons," so the Litigation Trustee, who likewise seeks to bring claims on behalf of the Company, is barred from doing so. Former Non-Management Directors' Memorandum of Law in Support of their Motion to Dismiss the Complaints ("Director Mem."), Dkt. No. 326, at 9. As the Litigation Trustee points out, however, the plain terms of the 2014 Settlement specify that the only "Releasing Persons" -- that is, the only people giving up their right to sue -- were the six named plaintiffs and the class, a group that is itself defined to exclude the Company. Under the plain terms of the 2014 Settlement, then, the Company, on whose behalf the Litigation Trustee brings these claims, is not a "Releasing Person" and is not barred from bringing these claims.

In their reply brief, the defendants suggest that even if the Company was not itself a Releasing Person, it was still a party to the 2014 Settlement and therefore, under the terms of the 2014 Settlement, "waive[d] its rights to the extent permitted by state law, federal law, foreign law or principle of common law, which may have the effect of limiting the release set forth above."

14

Stipulation and Settlement at 3. That argument also misses the mark. By bringing these claims, the Litigation Trustee does not limit the release set forth in the 2014 Settlement because, as just explained, the 2014 Settlement does not release the Company's claims in the first instance. The Litigation Trustee's claims are therefore not barred by the 2014 Settlement.

Furthermore, even if one were to assume <u>arguendo</u> that the 2014 Settlement did bar the Litigation Trustee's fiduciary duty claims, it would not bar plaintiffs' fraudulent conveyance claims. The 2014 Settlement extends only to claims that could have been brought by the shareholder plaintiffs "in their capacity as shareholders." Stipulation and Settlement, ¶¶ 1(t) & 3) (defining and releasing "Settled Claims"). Fraudulent conveyance claims, however, can be brought only by or on behalf of creditors. <u>See</u> Plaintiffs' Opposition to Joinder of the Former Employee Defendants to the Motions to Dismiss of (A) the Former Officer Defendants and (B) the Former Non-Management Directors, Dkt. No. 358, at 2-3 (citing <u>Riis v. Mfrs. Hanover Trust Co.</u>, 632 F. Supp. 1098, 1101 n.2 (S.D.N.Y. 1986)). Because the shareholder plaintiffs could not have brought these fraudulent conveyance claims "in their capacity as shareholders," the claims are not barred by the 2014 Settlement.

ii. <u>Whether Res Judicata Bars these Claims</u>

Defendants also argue that the New York court's dismissal of the 2014 Litigation on the merits and with prejudice precludes the Litigation Trustee's claims in this case. Federal courts apply New York law to determine the preclusive effect of a New York state court judgment on a federal action. Simmons v. Trans Express Inc., 955 F.3d 325, 328 (2d Cir. 2020). Under New York law, "res judicata, or claim preclusion, bars successive litigation based upon the same transaction or series of connected transactions if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." People ex rel. Spitzer v. Applied Card Sys., Inc., 11 N.Y.3d 105, 122 (2008).[10] To establish privity under New York law, "the connection between the parties must be such that the interests of the nonparty can be said to have been represented in the prior proceeding." Green v. Santa Fe Industries, Inc., 70 N.Y.2d 244, 253 (1987).

In addition, while the preclusive effect of a state-court judgment is determined by the substantive law of that state, that law remains "subject to due process limitations." Taylor v.

---

[10]   The Litigation Trustee does not dispute that the 2014 Litigation resulted in a judgment on the merits. For good reason. See Marvel Characters, Inc. v. Simon, 310 F.3d 280, 287 (2d Cir. 2002) ("It is clear that a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment for res judicata purposes.").

Sturgell, 553 U.S. 880, 891 (2008); see also Kremer v. Chemical Const. Corp., 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment."). As a matter of due process, a judgment can have preclusive effect against a nonparty only where, as relevant here, the nonparty was "adequately represented by someone with the same interests who was a party to the suit." Taylor, 553 U.S. at 894.[11] "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) [t]he interests of the nonparty and her representative are aligned, [and] (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty. Id. at 900.[12]

It is well-established that a judgment rendered in derivative action "brought on behalf of the corporation by one shareholder

---

[11]    The Taylor Court identified five other exceptions to the general rule against nonparty preclusion; none is relevant here. 553 U.S. at 893-95.

[12]    In certain situations, the Supreme Court has suggested, there must also have been "notice of the original suit to the persons alleged to have been represented." Taylor, 553 U.S. at 897. However, "federal courts have signaled that derivative suits are situations where notice is not required to comply with Due Process." See Cal. State Teachers' Ret. Sys. v. Alvarez, 179 A.3d 824, 851 (Del. 2018).

will generally be effective to preclude other actions predicated on the same wrong brought by other shareholders." Parkoff v. Gen. Tel. & Electronics Corp., 53 N.Y.2d 412, 420 (1981); see also Dana v. Morgan, 232 F. 85, 89 (2d Cir. 1916) ("[I]n [derivative] suits the wrong to be redressed is the wrong done to the corporation and as the corporation is a necessary part to the suit, it inevitably follows that there can be but one adjudication on the rights of the corporation.").

Relying on this foundational rule, defendants argue that the Litigation Trustee, who, like a shareholder plaintiff in a derivative action, asserts the claims of the Company, is foreclosed from doing so where, as here, those claims have already been litigated in a prior derivative action. Dir. Mem. at 11. In response, the Litigation Trustee contends that the shareholder plaintiffs did not adequately represent "the interests of the creditors whose interests are protected by the Litigation Trustee" because the "the shareholders' assertions were the opposite of those creditors would have made." Pl. Dir. Mem. at 10. Thus, the issue here, which could be framed either as a matter of state-law privity or constitutional due process, is whether the Litigation Trustee, asserting claims against the directors and officers on behalf of the Company, was adequately represented by the shareholder plaintiffs, who sought to bring derivative claims on

18

behalf of the Company against those same defendants in connection
with the same transaction.

As a threshold matter, the parties dispute the significance
of the fact that the shareholder plaintiffs settled their claims
before they technically obtained derivative standing -- that is,
before they were formally authorized to bring claims on behalf of
the Company. The Litigation Trustee contends that because the 2014
litigation was never recognized as a derivative action, the
judgment in that case cannot be res judicata to the Company, and,
by extension, to the Litigation Trustee. Pl. Dir. Mem. at 10. The
Litigation Trustee, however, cites no case law to support such a
proposition. In fact, courts regularly treat dismissal of a
derivative suit on demand grounds as binding on other shareholders,
even though such a dismissal necessarily occurs before the
plaintiffs obtained derivative standing. See, e.g., Arduini v.
Hart, 774 F.3d 622, 633 (9th Cir. 2014) (applying Nevada law); In
re Sonus Networks, Inc. Shareholder Deriv. Litig., 499 F.3d 47
(1st Cir. 2007) (applying Massachusetts law); Henik ex rel.
LaBranche & Co., Inc. v. LaBranche, 433 F. Supp. 2d 372, 381
(S.D.N.Y. 2006) (applying New York law); Alvarez, 179 A.3d 824
(applying Arkansas law).[13] These rulings largely proceed on the

---

[13]   In so ruling, these cases distinguish derivative actions from
traditional class actions, where the Supreme Court has made clear
that a denial of class certification is binding only as to the

assumption that "the [derivative] standing analysis for one
shareholder will not differ from the [derivative] standing
analysis for another shareholder." LaBranche, 544 F. Supp. 2d at
381.[14]

However, even assuming these cases apply beyond the demand
futility context, they all recognize that a different preclusion
analysis must result where the plaintiff in the earlier action "is
alleged to have inadequately represented the interests of all of
the shareholders." Id.; see, e.g., In re Sonus Networks, 499 F.3d
at 64 ("However established the principle that the same party, the
corporation, has sued in each derivative action, it is subject to
an important caveat: to bind the corporation, the shareholder
plaintiff must have adequately represented the interests of the
corporation.").

Here, the Litigation Trustee alleges just that. Whereas the
shareholder plaintiffs argued that the directors and officers
breached their fiduciary duty by failing to generate enough money

_____

named plaintiff. See Smith v. Bayer Corp., 564 U.S. 299, 315-16
(2011).

[14]   But cf. Freedman v. Redstone, 753 F.3d 416, 425 (3d Cir. 2014)
(holding, as a matter of New York law, that a court's prior
determination that a particular director was not independent did
not bar re-litigation of that issue in a subsequent derivative
suit because "[a] determination of a director's independence . . .
is concerned with a possibly fluid relationship" and a director
may be interested with respect to one but not another challenged
transaction).

for the shareholders, the Litigation Trustee now argues that the directors and officers breached their fiduciary duty by distributing too much money to shareholders, thereby rendering the Company insolvent. Id. While the two sets of claims challenge the same one transaction, the incentives of the shareholder plaintiffs -- to generate more money for the shareholders -- were directly opposed to those of the Litigation Trustee, who seeks in this very action, for example, to claw back money paid to the shareholders as fraudulent conveyances. Cf. In re Healthco Intern., Inc., 208 B.R. 288, 308 (Bankr. D. Mass. 1997) ("[I]t makes no sense to say the Trustee stands in privity to the class action plaintiffs in [the earlier action]. The Trustee has included as defendants in the present suit those very stockholders, seeking to avoid the payments made to them on the grounds they were fraudulent transfers.").[15] Indeed, it is little surprise that the shareholder plaintiffs, who wanted the Company to pay them more money, did not

---

[15]    To be sure, Healthco is not entirely on point. There, the earlier shareholders had brought a direct action in their capacity as shareholders, rather than, as here, a derivative action putatively on behalf of the corporation. 208 B.R. at 307-08. Nevertheless, the Healthco court's discussion of the structural conflict between shareholders seeking to maximize payout and a bankruptcy trustee who seeks to challenge those payouts is instructive.

make the argument, now made by the Litigation Trustee, that the Company, in order to avoid insolvency, should have paid them less.[16]

There is a general principle lurking here. A litigation trustee, like a bankruptcy trustee but unlike shareholders bringing derivative claims, represents the interests of creditors of the bankruptcy estate. That is why, as the Third Circuit has persuasively explained, "the legal relationship between the trustee and the pre-bankruptcy debtor is incomplete, particularly when the interests of the creditors diverge from those of the debtor." In re Montgomery Ward, LLC, 634 F.3d 732, 738 (3d Cir. 2011). For that reason, the Court finds that, in this case, the shareholder plaintiffs did not adequately represent the interests

---

[16]    The Litigation Trustee also argues, albeit less persuasively, that there is no res judicata because "critical evidentiary elements required to support [his claims] were not at issue in the 2014 Litigation. Pl. Dir. Mem. at 11. While it is true that, under federal common law, a "party seeking res judicata must show that the same evidence is needed to support both claims," Id. (quoting King v. Fox, 418 F.3d 121, 131 (2d Cir. 2005)), New York law imposes no such requirement. Instead, "New York takes a transactional approach to res judicata." Yessir v. GMAC Mortg. Corp., 535 F. Supp. 2d 413, 422 (S.D.N.Y. 2008). "[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." Sosa v. J.P. Morgan Chase Bank, 33 A.D.3d 609, 611 (2d Dep't 2006). As a result, "[w]hen alternative theories are available to recover what is essentially the same relief for harm arising out of the same or related facts such as would constitute a single factual grouping, the circumstance that the theories involve materially different elements of proof will not justify presenting the claim by two different actions." O'Brian v. City of Syracuse, 54 N.Y.2d 353, 357 (1981).

of the Litigation Trustee.[17] His claims are therefore not barred by res judicata.

### iii. Whether the SLC Process Forecloses these Claims

As a final procedural bar to the Litigation Trustee's claims, defendants argue that even if the 2014 Settlement did not bar the claims, they must nevertheless be dismissed because a special litigation committee investigated the shareholder plaintiffs' claims, found that the Board "more than adequately represented the interests of the Company," and recommended that the Company "not file suit against the Board." Report of the Special Litigation Committee at 118. Under Pennsylvania law, which all parties agree controls this issue,[18] if an SLC determines that no wrongdoing occurred and that litigation should not proceed, a court must enforce that determination, so long as the court finds that the members of the SLC meet certain qualifications and that "the

---

[17] Durkin v. Shea, 957 F. Supp. 1360 (S.D.N.Y. 1997), a case relied upon by defendants, is not to the contrary. That case stands for the basic proposition that a bankruptcy trustee stands in the debtor's shoes when he brings a claim held by the debtor. Id. at 1372. Here, even though the Litigation Trustee stands in the Company's shoes, the Court holds that the shareholder plaintiffs inadequately represented the set of interests now represented by the Litigation Trustee.

[18] As the parties recognize, Pennsylvania law governs any challenge to the SLC because Jones Group was incorporated in Pennsylvania. See Seybold v. Groenink, No. 06-cv-772 (DLC), 2007 WL 737502, at *5-7 (S.D.N.Y. Mar. 12, 2007).

committee acted in good faith, independently and with reasonable care." 15 Pa. Cons. Stat. § 1783.

Here, however, as the Litigation Trustee suggested during oral argument, see Transcript dated October 21, 2020 at 18:25-19:8 ("Tr."), an SLC's determination is binding only with respect to putative derivative actions brought by shareholder plaintiffs, who seek to wrest from the board of directors the right to bring claims on behalf of the company. Indeed, Pennsylvania law is clear that an SLC's determination bears only on whether shareholders can maintain a derivative action. See 15 Pa. Cons. Stat. § 1783(f) ("If a special litigation committee is appointed and a derivative action is commenced either before or after a determination . . . ."). By contrast, the Company -- and, by extension, the Litigation Trustee -- is free to pursue claims against directors and officers even where an SLC report would bar shareholders from doing the same. The Litigation Trustee's claims are therefore not barred by the SLC process.[19]

### B. Directors' Motion to Dismiss

---

[19]   Moreover, even if the Company itself were somehow irrevocably bound by the SLC's determination, a court must dismiss a claim based on an SLC's determination only where the SLC has made an "adequate investigation" of the claim. See Cuker v. Mikalauskas, 692 A.2d 1042, 1048 (Pa. 1997). Here, since the SLC was never presented with -- and thus never considered -- the present argument that the directors and officers breached their duties by pursuing a transaction that rendered the Company insolvent, the SLC process would not bar the instant claims.

The Litigation Trustee claims that the directors (1) breached their fiduciary duty to the Company and (2) aided and abetted Kaluzny's and Morrow's fiduciary breaches to the Company once they became the sole directors of Nine West. Compl. ¶¶ 155-180. The director defendants move to dismiss these claims.

### i. Breach of Fiduciary Duty

Under Pennsylvania law,[20] a director must perform his duties "in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Cons. Stat. § 1712. In other words, a director's fiduciary obligation includes both a duty of care and a duty of loyalty. See Kelly v. Peerstar LLC, No. 18-cv-126 (KRG), 2020 WL 5077940 at *14 (W.D. Pa. Aug. 5, 2020).

The director defendants move to dismiss the Litigation Trustee's breach of fiduciary duty claims on the grounds that: (1) he cannot overcome the business judgment rule; and (2) even if he could overcome the business judgment rule, he cannot overcome the

---

[20]    It is undisputed that Pennsylvania law governs the fiduciary duty claims because the director defendants are alleged to have breached their fiduciary duties to Jones Group, which was incorporated in Pennsylvania. See Officer Mem. at 9 n.5; Pl. Off. Mem. at 5 n.3.

exculpatory provisions in Jones Group's bylaws, which limits the contexts in which directors could be liable for monetary damages.

### 1. Whether the Business Judgment Rule Precludes Liability

The business judgment rule ordinarily "insulates a director from liability for decisions made: (1) in good faith; (2) where the director or officer is not interested in the subject of the business judgment; (3) is informed with respect to the subject of the business judgment to the extent he reasonably believes to be appropriate under the circumstances; and (4) rationally believes that the business judgment in question is in the best interests of the corporation. In re Lampe, 665 F.3d 506, 516-17 (3d Cir. 2011). Typically, a breach of fiduciary duty renders the business judgment rule inapplicable. See In re Total Containment, Inc., 335 B.R. 589, 606 n.6 (E.D. Penn. 2005); see also 15 Pa. Cons. Stat. § 1715(d) ("Absent breach of fiduciary duty . . . any act as the board of directors, a committee of the board or an individual director shall be presumed to be in the best interests of the corporation.") (emphasis added).

In the context of mergers and acquisition, however, Pennsylvania law affords additional deference to directors. Indeed, in enacting § 1715, "the Pennsylvania legislature specifically intended that Courts defer to directors' decisions concerning mergers and acquisitions." Simmons v. Sutherland, No.

80-E of 1998, 1998 WL 3550554, at *7 (Pa. Com. Pl. Nov. 25, 1998).
Under § 1715, so long as a "majority of the disinterested
directors" approve the merger, such approval is "presumed to
satisfy the [foregoing] standard . . . , unless it is proven by
clear and convincing evidence that the disinterested directors did
not assent to such act in good faith after reasonable
investigation." Thus, to overcome Pennsylvania's business judgment
rule, the Litigation Trustee must either allege that the majority
of the Board was not disinterested or that the directors did not
assent to the 2014 Transaction in good faith after reasonable
investigation.

### a. Disinterested Directors

The director defendants argue that the Litigation Trustee has
not alleged facts showing that the majority of directors were not
disinterested. Section 1715 defines the term "disinterested
director," for the purposes of that section only, to include a
director of the to-be-acquired corporation other than:

> A director who has a direct or indirect financial or
> other interest in the person acquiring or seeking to
> acquire control of the corporation or who is an affiliate
> or associate . . . of, or was nominated or designated as
> a director by, a person acquiring or seeking to acquire
> control of the corporation.

15 Pa. Cons. Stat. § 1715(e)(1)(i). The provision goes on to
explain that "[a] person shall not be deemed to be other than a
disinterested director solely by reason of . . . [t]he ownership

by the director of shares of the corporation [or] [t]he receipt as a holder of any class or series of any distribution made to all owners of shares of that class or series." Id. § 1715(e)(2)(i), (ii). In other words, § 1715 views an interested director as one who stands on both sides of the transaction, but not otherwise.

Ignoring the clear command of § 1715, the Litigation Trustee contends that the directors were not disinterested because they financially benefited from the Transaction since it triggered both the accelerated vesting of certain restricted shares and the right to receive $15 per share for their common shares and restricted shares. Pl. Dir. Mem. at 16-17. He further contends that while Pennsylvania law does "not address interestedness in the context of a divergence of interests between directors of an insolvent corporation and its creditors," under Delaware law, a "director of an insolvent corporation is interested in a transaction if he or she receives a personal benefit not shared by all of the insolvent corporation's creditors." Id. at 20. While the Litigation Trustee might accurately describe Delaware law, Pennsylvania law, as just discussed, is different and expressly rejects the Litigation Trustee's theory of interestedness. The Litigation Trustee cites to no Pennsylvania case law, and the Court has found none, that admits of an exception to this rule in cases where the corporation is nearing insolvency. Accordingly, the Litigation Trustee has failed to plead that the directors were not disinterested.

b. Failure to Investigate and Assent

The Litigation Trustee is more successful in alleging that the director defendants did not conduct a "reasonable investigation" into whether the 2014 Transaction -- as a whole -- would render the Company insolvent. The complaints allege that director defendants did not investigate whether the Additional Debt and Carve-Out Transactions would render the Company insolvent. Compl. ¶¶ 113, 165. Indeed, the director defendants expressly disclaimed any evaluation of whether those components of the 2014 Transaction would be fair to the Company. Compl. ¶¶ 66-67. Moreover, the complaints allege that the director defendants failed to conduct an investigation even after Sycamore made the deal less favorable to the Company, even though the "fiduciary out" clause would have permitted them to terminate the agreement. Id. ¶ 110. Because the business judgment rules "presupposes that directors made a business judgment," the Litigation Trustee contends that it does not protect directors with respect to matters they expressly did not consider. Pl. Dir. Mem. at 19.

In response, the director defendants insist that they had no obligation to investigate the solvency of the Company after the Additional Debt and Carve-Out Transactions because they had no role in those components of the 2014 Transaction, which were effectuated after they ceased to be directors of the Company.

Director Mem. at 21. Therefore, they can "face no fiduciary liability with respect" to them. Id.

The Court disagrees. Multistep transactions can be treated as one integrated transaction where, as here, the plaintiff pleads that the transaction "reasonably collapse[s] into a single integrated plan" and "where the plaintiff pleads a cause action for breach of fiduciary duty based on the foreseeability of the alleged harm." See, e.g., In re Hechinger Investment Co. of Delaware, 274 B.R. 71, 91 (D. Del. 2002). In Hechinger, the district court, faced with a two-step LBO transaction, rejected the director defendants' argument that "they merely approved the merger step of the LBO, and not the pledging of the post-LBO debtor's assets." Id. at 90. Drawing all inferences in favor of the plaintiff, the court held, among other things, that the plaintiff had "stated a cause of action for breach of fiduciary duty based on the foreseeability of the alleged harm," even if the director defendants did not formally approve every component of the contested transaction. Id.[21]

---

[21]   Although Hechinger is a Delaware case applying Delaware law, Pennsylvania case law is not to the contrary. Indeed, Hechinger itself relies on United States v. Tabor Court Realty, 803 F.2d 1288, 1302 (3d Cir. 1986), a Third Circuit case construing Pennsylvania law, for the general proposition that, in certain circumstances, courts may treat multistep LBO transactions as "one integrated transaction." While Tabor Court dealt with fraudulent conveyance claims, not fiduciary duty claims, that is a distinction without a difference, not least because, under Pennsylvania law, directors can "breach their fiduciary duty owing to [the company]

In their reply brief, the director defendants seek to distinguish Hechinger because in that case the plaintiff "alleged facts showing that the fiduciaries were impermissibly interested in the underlying LBO transaction." Former Non-Management Directors' Reply Memorandum of Law in Further Support of their Motion to Dismiss the Complaints, Dkt. No. 365, at 9. Here, by contrast, the Litigation Trustee's only theory of "self-interest," as discussed, is not actionable under Pennsylvania law. Id. But this argument is misplaced. As discussed, Pennsylvania law does not require a finding of self-interestedness to overcome the business judgment rule; a director's failure to make a reasonable investigation is enough. Because the director defendants made no investigation whatsoever into the propriety of the Additional Debt and Carve-Out Transactions, they cannot take cover behind the business judgment rule with respect to those components of the 2014 Transaction.

   2. Whether the Jones Group Bylaws Preclude
      Liability

Even where a director has breached his fiduciary duties, however, Pennsylvania law permits shareholders to adopt bylaws limiting director liability to cases where the breach constitutes

---

. . . when they participate[] in the fraudulent conveyance of [the Company's] assets to [an acquirer] for less than full consideration." See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 217 n.25 (3d Cir. 1990).

"self-dealing, willful misconduct, or recklessness." 15 Pa. Cons. Stat. § 1713(a). At all relevant times, Jones Group had such an exculpatory bylaw. See The Jones Group Inc., Quarterly Report (Form 10-Q) Ex. 3.1 at 21 (Apr. 27, 2012). Thus, even if the complaints adequately allege breach of fiduciary duty, they must also allege either recklessness or self-dealing.[22]

### a. Self-Dealing

Unlike the term "disinterested," which is defined in § 1715 for the purposes of the business judgment rule, the term "self-dealing," as used in § 1713, is left undefined. In addition, the Court was not directed to, and could not itself find, any cases construing Pennsylvania's exculpatory bylaw provision. In the absence of controlling authority, the parties offer competing definitions of "self-dealing." Citing Delaware case law, the director defendants contend that self-dealing occurs only where a director appears "on both sides" of a transaction. Director Mem. at 15 (citing Gilbert v. El Paso Co., Civ. A. Nos. 7075, 7079, and 7078, 1988 WL 124325, at *8 (Del. Ch. Nov. 21, 1988), aff'd, 575 A.2d 1131 (Del. 1990)). The Litigation Trustee, on the other hand, citing to a Pennsylvania case dealing with a municipal zoning dispute, suggests that self-dealing captures a broader set of actions and includes "[p]articipation in a transaction that

---

[22]  The Litigation Trustee does not contend that the director defendants engaged in willful misconduct. See Pl. Dir. Mem. at 12.

benefits oneself instead of another who is owed a fiduciary duty." Pl. Dir. Mem. at 16 (quoting Honey Brook Estates v. Honey Brook Tp., No. 09-cv-6190, 2012 WL 2076985, at *14 (E.D. Pa. June 7, 2012)).

The Court agrees with the director defendants and declines to give such broad meaning to the term "self-dealing." Under Delaware law, as the director defendants point out, the term "self-dealing" describes "the situation when a [corporate fiduciary] is on both sides of a transaction." Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1169 (Del. 1995). Self-dealing, however, is just one way that a director could become interested in a given transaction; even where a director has not engaged in "classic self-dealing," she may still be self-interested in a given transaction where she has a "substantial" interest in it. Id.; see also Robotti & Co., LLC v. Liddell, C.A. No. 3128-VCN, 2010 WL 157474, at *12 n. 98 (Del. Ch. Jan. 14, 2010) (discussing the difference between "self-dealing" and "incidental director interest"). In other words, under Delaware law, the term "self-dealing" constitutes one, but not the only, way for a director to become self-interested in a transaction.

While § 1713's "reference to self-dealing . . . may pick up a great many duty of loyalty violations," see Mark A. Sargent and Dennis R. Honabach, Director and Officer Liability Handbook, § PA:1, the Court is not inclined to expand the reach of the term

beyond what is accepted under Delaware law. If the Pennsylvania legislature had intended to sweep in a broader set of conflicts beyond classic self-dealing, it would have done so. But taking the statute as it is written, the Court concludes that self-dealing is limited to those situations where the director stands on both sides of the transaction. Because, here again, the Litigation Trustee does not allege that the directors stood on both sides of the 2014 Transaction, or had any affiliation with Sycamore for that matter, the Court holds that he has not established self-dealing.

### b. Recklessness

The director defendants also argue that the complaints fail to plead that they acted recklessly. Director Mem. at 16. To plead "recklessness," the Litigation Trustee must allege that the directors knew, or had reason to know, of facts that created a degree of risk that the 2014 Transaction would harm the Company, and that they deliberately acted or failed to act in disregard of the risk. See SHV Coal, Inc. v. Cont'l Grain Co., 587 A.2d 702, 704 (Pa. 1991) (generally defining the term "recklessness").

The Court holds that the complaints adequately allege that the director defendants were reckless in approving the 2014 Transaction. As detailed above, the complaints allege that the director defendants consciously disregarded whether the Additional Debt and Carve-Out Transactions were in the interest of the Company, specifically excluding those elements of the 2014

Transaction from their assessment. Compl. ¶ 66. Moreover, the complaints allege certain "red flags" that should have put the director defendants on notice that the Additional Debt and Carve-Out Transactions would leave the Company insolvent. For example, the $2.2 billion valuation the Company received in the 2014 Transaction minus the $800 million historical purchase price of the Carve-Out Businesses implied that the rest of Jones Group (i.e., RemainCo) was worth no more than $1.4 billion. That knowledge should have alerted the director defendants that they needed to investigate RemainCo's solvency, given that Sycamore arranged, with their knowledge, for RemainCo's debt to be increased to $1.55 billion. See Compl. ¶ 115. In addition, RemainCo's debt would be 7.8 times the Adjusted EBITDA calculated by the Company's management and 6.6 times the Adjusted EBITDA figure produced by Sycamore -- both higher than the 5.1 multiple that Citigroup had advised the Board that the Company could sustain in a scenario where it retained all its businesses. Id. ¶ 108. In spite of these red flags, the Board did not make any inquiry into RemainCo's solvency; to the contrary, the Board expressly disclaimed any view of the Additional Debt and Carve-Out Transactions. This, the Court holds, was reckless.

At this stage of the case, taking all allegations as true and making all reasonable inferences in the light most favorable to the Litigation Trustee, the Court holds that the complaints have

stated a claim for breach of fiduciary duty against the director defendants. Moreover, because the director defendants failed to make a reasonable investigation (or any investigation, for that matter) into the Additional Debt and Carve-Out Transactions even in the face of red flags suggesting the 2014 Transaction would render the Company insolvent, they are not entitled to the protections of the business judgment rule or the Company's exculpatory bylaw. For that reason, their motion to dismiss the breach of fiduciary duty claims is denied.

ii. Aiding and Abetting Breach of Fiduciary Duty

The Litigation Trustee's second cause of action against the director defendants is for aiding and abetting Kaluzny's and Morrow's fiduciary breaches to Nine West by approving the Merger and substantially assisting in carrying out the remaining elements of the Transaction. Compl. ¶ 175. To state a claim for aiding and abetting a breach of fiduciary duty under Delaware law,[23] a plaintiff must plead: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages

---

[23]   It is undisputed that Delaware law governs the aiding and abetting claims because the director defendants are alleged to have aided and abetted the breach of Kaluzny's and Morrow's fiduciary duties to Nine West, which was incorporated in Delaware. See Officer Mem. at 13 n.8; Pl. Off. Mem. at 12 n.9.

proximately caused by the breach." <u>RBC Capital Markets, LLC v.</u>
<u>Jarvis</u>, 129 A.3d 816, 862 (Del. 2015).

The director defendants' motion to dismiss these claims rests
on two arguments: (1) that any acts taken before Kaluzny and Morrow
became directors -- and, therefore, before Kaluzny and Morrow had
any fiduciary duties to Nine West -- cannot form the basis of an
aiding and abetting claim; and (2) that even if such actions could
support a claim, the complaints do not adequately plead that the
directors defendants "knowingly participated" in the breaches.

On their first argument, the director defendants cite no case
law to support the proposition that the aider and abettor's
assistance must occur while the fiduciary duty exists. Such a
limitation, moreover, is senseless. A hypothetical proves the
point. Suppose that, the day before a person is set to assume her
role as director of a corporation, she asks a friend for help with
a scheme to defraud the corporation. The friend agrees to help and
lends substantial preparatory assistance that day. The following
day, the newly enshrined director executes her scheme to defraud
the corporation, relying on the help that her friend had provided
the day before. Should the friend, who only assisted the director
before she took office, escape liability simply because the
director's fiduciary duties hadn't yet attached? Seeing no reason
for such an artificial limitation, the Court rejects the director
defendants' first argument.

On their second argument, the director defendants contend that the complaints fail to allege that they "knowingly participated" in Kaluzny's and Morrow's fiduciary breach. Director Mem. at 23. To the contrary, the complaints allege that Sycamore, along with Kaluzny and Morrow, kept their bad acts a secret from the director defendants. Id. For the same reasons discussed above, however, the Court holds that Litigation Trustee has adequately pleaded that the director defendants had actual or constructive knowledge that Kaluzny and Morrow would carry out the contemplated Carve-Out Transactions and that such actions would leave the Company insolvent. By approving the Merger, knowing that Kaluzny and Morrow would execute the Carve-Out Transactions and leave the Company insolvent, the director defendants are alleged to have aided and abetted Kaluzny's and Morrow's fiduciary breach. Accordingly, the Court denies the motion to dismiss the aiding and abetting claims.

   C. Officers' Motion to Dismiss the Breach of Fiduciary
      Duty and Aiding and Abetting Claims

The Litigation Trustee also brings breach of fiduciary duty and aiding and abetting claims against the officer defendants.[24] The officer defendants move to dismiss both claims.

   i. Breach of Fiduciary Duty

---

[24]   The breach of fiduciary duty and aiding and abetting claims were not alleged against defendants DiPietrantonio or Tejero-DeColli.

Under Pennsylvania law, an officer is required to "perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care, including reasonable inquiry, skill, and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Const. Stat. § 1712(c). Officers do not, however, "owe fiduciary duties to a corporation regarding aspects of the management of the corporation that are not within their responsibility or are within the exclusive province of the board." See In re Verestar, Inc., 343 B.R. 444, 474 (Bankr. S.D.N.Y. 2006). But "officers may be held liable for breach of fiduciary duty to the extent that they have discretionary authority over, and the power to prevent, the complained of transactions, in which case they will be held to the same standards as a director." Id.

The officer defendants argue that the breach of fiduciary duty claims fail because the Litigation Trustee seeks to hold them liable for failing to take actions that were out of their control. Officer Mem. at 11. In response, the Litigation Trustee homes in on three allegations that, he says, were within the scope of the officers' authority: the officers failed to (1) engage an expert to assess RemainCo's solvency or to otherwise investigate solvency; (2) consider whether Company should exercise the "fiduciary out" clause; and (3) make any recommendations regarding these rights. Pl. Off. Mem. at 7.

The Court holds that these allegations are insufficient to state a claim for breach of fiduciary duty because they do not plausibly support the inference that the officers had the power to prevent the 2014 Transaction. To be sure, the Litigation Trustee suggests that, had the officers "investigated, communicated, and acted upon" their knowledge about the danger and unfairness of the 2014 Transaction, it could have been prevented. Id. But that argument is simply not plausible. The theory of the complaints is that the directors were aware of, and ignored, all sorts of red flags regarding the 2014 Transaction. Even making all inferences in the Litigation Trustee's favor, there is no reason to believe that, had the officers brought these issues to the directors' attention, a different result would have obtained.[25] While the officers are alleged to have carried out certain actions that facilitated the 2014 Transaction -- like participating in rating agency presentations to syndicate the Additional Debt -- that is not enough to establish that their actions could have prevented the 2014 Transaction from occurring. Accordingly, the Court grants

---

[25]   Indeed, if it were the case that a different result would have obtained, that would undermine the claims against the directors, whose failure to stop the 2014 Transaction would begin to look more like negligence than recklessness.

the officer defendants motion to dismiss the breach of fiduciary duty claims.[26]

## ii. Aiding and Abetting Breach of Fiduciary Duty

The Litigation Trustee also brings claims against the officer defendants for aiding and abetting Kaluzny's and Morrow's fiduciary breaches to Nine West. As discussed above, to state a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must plead: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." Jarvis, 129 A.3d at 862. The officer defendants argue that these claims fail because the complaints do not adequately allege knowing participation or proximate causation.[27]

"[T]he element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator." In re Oracle Corp. Deriv. Litig., C.A. No. 2017-

---

[26]   The officer defendants also accuse the Litigation Trustee of impermissible group pleading. Officer Mem. at 10. However, the complaints allege specific conduct of each officer -- and each director for that matter -- underlying the breach of duty claims against them. See Pl. Off. Mem. at Appendix A.

[27]   The officer defendants also argue, like the director defendants did, that there can be no claim for aiding and abetting where the assistance occurs before the fiduciary duty exists. For the reasons already discussed, the Court rejects that argument.

0337-SG, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020). To make this determination, a "court may consider, among other factors, the nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects and the amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct." Id. "To withstand a motion to dismiss, a plaintiff must plead facts making it reasonably conceivable that the defendant knowingly supported a breach of duty and that his resulting assistance to the primary actor constituted substantial assistance in causing the breach." Id.

The officer defendants argue that alleged assistance -- namely, participating in presentations to rating agencies and failing to encourage the Board to stop the 2014 Transaction -- show, "at best," that the officers provided "tangential" assistance. Officer Mem. at 15. The Court agrees with the officer defendants. Unlike the director defendants, who are alleged to have provided substantial assistance to Kaluzny and Morrow by approving the 2014 Transaction, the officer defendants, at most, participated in certain actions that helped the 2014 Transaction along. Such assistance, the Court finds, is insufficient to support a claim for aiding and abetting a breach of fiduciary duty. For

similar reasons, the Court finds that the complaints fail to allege that the officer defendants "proximately caused" Kaluzny's and Morrow's fiduciary breaches. Simply put, there are no allegations, and no plausible inferences, that the officer defendants could have done anything to prevent the 2014 Transaction from occurring or that their actions were a "substantial factor" in causing the breach.[28]

D. Officer Defendants' Motions to Dismiss the Fraudulent Conveyance Claims

The Litigation Trustee and the Indenture Trustee seek to avoid the change in control payments made to certain officer and employee defendants. In particular, the Litigation Trustee seeks to avoid the payments under 11 U.S.C § 544(b), which grants a trustee the authority to bring state law avoidance claims. Compl. ¶¶ 203-209. The Indenture Trustee seeks to avoid the payments under state law. See Plaintiff Wilmington Savings Fund Society, FSB's Response to the Former Officer Defendants' Notice of Partial Withdrawal of Joinder to the Motion to Dismiss of Kathleen Nedorostek Kaswell,

---

[28] The Litigation Trustee contends that the causation inquiry looks not to whether the aider's assistance caused the breach but only to whether the breach caused damages. Pl. Off. Mem. at 14-15. While the Supreme Court of Delaware has recited the rule in a manner that suggests the Litigation Trustee is correct, it has applied the rule in a manner that makes clear that the aider's assistance must proximately cause the breach of fiduciary duty. See Jervis, 129 A.3d at 865 ("The record evidence amply supports the trial court's conclusion that RBC purposely misled the Board so as to proximately cause the Board to breach its duty of care.").

Dkt. No. 379.[29] The defendants move to dismiss these claims on the following grounds: (1) the Litigation Trustee's claims are untimely as to defendants Donnalley and Tejero-DeColli; and (2) both the Litigation Trustee's and the Indenture Trustee's claims are inadequately pleaded.[30]

> i. Whether the Litigation Trustee's Fraudulent Conveyance Claims against Defendants Donnalley and Tejero-DeColli are Timely

The officer defendants argue that the Litigation Trustee's[31] fraudulent conveyance claims against defendants Donnalley and Tejero-DeColli are time-barred under § 546(a) of the Bankruptcy code. See Kaswell Mem. at 8; Officer Joinder at 2.[32] Section 546(a)

---

[29]   It is undisputed that New York law governs both the Litigation Trustee's and the Indenture Trustee's fraudulent conveyance claims. Officer Mem. at 19-20; Pl. Off. Mem. at 16 n.12.

[30]   The defendants initially argued that the Indenture Trustee lacked standing to assert fraudulent conveyance claims with respect to change in control payments. See Memorandum of Law of Defendant Kathleen Nedorostek Kaswell in Support of Her Motion to Dismiss the First Amended Complaint ("Kaswell Mem."), Dkt. No. 330, at 7; Joinder of the Former Officer Defendants to the Motion to Dismiss of Kathleen Nedorostek Kaswell ("Officer Joinder"), Dkt. No. 335. However, the officer defendants expressly abandoned this claim at oral argument, see Tr. at 12:16-20, and formally withdrew the argument soon thereafter, see Dkt. No. 376.

[31]   Because the Indenture Trustee's claims are not brought pursuant to 11 U.S.C. § 544, the Bankruptcy Code's statute of limitations are inapposite.

[32]   As a threshold matter, the parties dispute whether this argument is properly before the Court. The argument was first raised in defendant Kaswell's memorandum in support of her motion to dismiss. See Kaswell Mem. While her motion was timely filed on September 7, 2020, the officer defendants did not file their

provides that an action seeking to avoid a fraudulent conveyance brought under § 544 of the Bankruptcy Code may not be commenced after, as relevant here, the earlier of (1) "2 years after the entry of the order for relief" or (2) "the time the case is closed or dismissed." 18 U.S.C. § 546(a).

Here, Nine West filed for bankruptcy on April 6, 2018 and an order for relief was filed the same day. See In re Nine West Holdings, Inc., No. 18-10947-scc, Dkt. No. 1 (Bankr. S.D.N.Y. Apr. 6, 2018) (entering order for relief). Nine West's bankruptcy was closed on March 31, 2020. See In re Nine West Holdings, Inc., No. 18-10947-scc, Dkt. No. 1673 (Bankr. S.D.N.Y. Mar. 31, 2020). Therefore, under § 546(a), any avoidance action pursuant to § 544 had to have been filed on or by March 31, 2020. The complaint against Donnalley and Tejero-DeColli, however, was not filed until

---

joinder to that motion until September 11, 2020 -- four days past the moving deadline. Thereafter, Kaswell settled her claims and withdrew her motion and memorandum of law. See Dkt. No. 353. Because the officer defendants' joinder was supposedly untimely and because Kaswell's motion and memorandum has since been withdrawn, plaintiffs contend that her argument is not properly before the Court. See Plaintiffs' Opposition to Joinder of the Former Officer Defendants to the Motion to Dismiss of Kathleen Nedorostek Kaswell, Dkt. No. 357, at 2. The Court rejects this hyper-technical argument. For one thing, the Court's scheduling order, Dkt. No. 20, set September 7, 2020 as the deadline for "moving papers"; it did not address joinders. For another, as the officer defendants point out, the arguments could be "raised in a motion pursuant to Rule 12(c), following the filing of an answer." Reply Memorandum in Response to Plaintiffs' Opposition to Former Officer Defendants' Joinder to the Motion to Dismiss of Kathleen Nedorostek Kaswell, Dkt. No. 362, at 1.

June 5, 2020. See Kirschner v. Kimmel, No. 20-cv-04287 (JSR), Dkt. No. 1 (S.D.N.Y. June 5, 2020). Because the Litigation Trustee's fraudulent conveyance claims are untimely as against Donnalley and Tejero-DeColli, the claims are dismissed.

>    ii.  Whether the Fraudulent Conveyance Claims are Adequately Pleaded

The officer defendants move to dismiss both the intentional and fraudulent conveyance claims as to the change in control payments.

>    1. Constructive Fraudulent Conveyance

To state a claim for constructive fraudulent conveyance under New York law, a plaintiff must plead that the transfer was made without fair consideration and that "one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital; or (iii) the transferor believes that it will incur debt beyond its ability to pay." In re Sharp Inter. Corp., 403 F.3d 43, 44 (2d Cir. 2005) (citing New York Debtor and Creditor Law ("DCL") §§ 273-75)).[33] The officer defendants do not argue that plaintiffs

_____

[33]   These DCL provisions "have been repealed and replaced -- effective April 4, 2020 -- by an act of the New York legislature approved on December 6, 2019." See Ray v. Ray, 799 Fed. App'x 29, 31 n.1 (2d Cir. 2020) (citing 2019 N.Y. Sess. Laws Ch. 580). The new provisions, however, do not "apply to a transfer made or

have failed to plead lack of "fair consideration." Pl. Off. Mem. at 16. Instead, they contend that plaintiffs have failed to meet any of the three just-mentioned conditions.

a. Solvency

"For purposes of the DCL, '[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured,'" Ray v. Ray, No. 18-cv-7035 (GBD), 2019 WL 1649981, at *6 (S.D.N.Y. Mar. 28, 2019) (quoting DCL § 271(1)). "The operative reference point for determining insolvency is the time at which the transfer took place." Kim v. Ji Sung Yoo, 311 F. Supp. 3d 598, 612 (S.D.N.Y. 2018). "[T]o enable a court to evaluate the sufficiency of a complaint's insolvency allegations on a motion to dismiss, the court looks for some sort of 'balance sheet' test or information provided that the court can use to infer that the transferor's liabilities exceeded their assets at the time the transfers took place." Ray, 2019 WL 1649981, at *8

Here, plaintiffs have alleged facts sufficient to support an inference that the Company was insolvent at the time it made the change in control payments. The complaints allege that Jones

---

obligation incurred before the act's effective date," or to "a right of action that has accrued before that effective date." Id. Accordingly, all references to the DCL are to its pre-April 4, 2020 provisions, which all parties agree control.

Group's $2.2 billion valuation minus the $800 million historical purchase price of the Carve-Out Businesses "implied that [Nine West] likely had a capital deficit." Id. ¶ 115. The complaints also allege that "[a] discounted cash flow analysis that applied reasonable and realistic projections for [Nine West] would have calculated a total enterprise value for [Nine West] that was hundreds of millions of dollars less than its debt of $1.55 billion, showing [Nine West] was insolvent." Compl. ¶ 126. These allegations allow for an inference, even if indirect, of insolvency.

The officer defendants' arguments to the contrary are unpersuasive. They contend that hypothetical discounted cash flow and comparable company analyses are "inapposite" because they do not "speak to the present value" of Nine West's assets at the time of the transfers. Other courts, however, have relied on such analyses. See, e.g., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co., 910 F. Supp. 913, 939 (S.D.N.Y. 1995) ("[A discounted cash flow analysis] is an appropriate method of determining the going concern value of a company that is not in imminent danger of collapse."). And this Court sees no reason why such analyses, even if forward-looking, cannot serve as proxies for present value.

The officer defendants also contend that the only pleaded enterprise value found in the complaints is $1.58 billion, which

exceeds the alleged $1.55 billion debt. Officer Mem. at 23-24;
Reply Memorandum of Law in Support of Former Officer Defendants'
Motion to Dismiss the Complaint ("Officer Reply"), Dkt. No. 361,
at 8. But the $1.58 billion figure was cited in the complaints as
Sycamore's allegedly inflated enterprise value, which was alleged
to have been specifically engineered to be "just above the $1.55
billion of debt." Compl. ¶ 71. That figure alone supports an
inference of insolvency, given that the entire thrust of the
complaints is that Sycamore fraudulently bloated the valuation of
the Company in order to justify a low purchase price for the Carve-
Out Businesses. Accordingly, the Court concludes that plaintiffs
have sufficiently alleged insolvency.[34] The Court therefore denies

---

[34]    Plaintiffs have not, however, adequately alleged facts to
meet the "unreasonable small capital" or the "ability to pay" test.
The "unreasonably small capital" test "reaches entities that are
technically solvent but doomed to fail." Innovative Custom Brands,
Inc v. Minor, No. 15-cv-2955 (AJN), 2016 WL 308805, at *3 (S.D.N.Y.
Jan. 25, 2016). Relevant factors include: "the transferor's debt
to equity ratio, historic capital cushion, and the need for working
capital in the transferor's industry." In re Operations NY LLC,
490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013). Instead of alleging the
Company's debt to equity ratio, the complaints allege that
Sycamore's equity contribution constituted 8% of Nine West's total
capitalization. But, as the officer defendants point out, the
complaints do not allege that that figure represented the total
value of Nine West's equity, nor do they allege any other facts
about the Company's historical capital cushion or working capital
needs. Officer Mem. at 25. As for the "ability to pay" test, a
plaintiff must allege that the defendant made the conveyance with
the "inten[t] or belie[f] that he will incur debts beyond his
ability to pay as they mature." DCL § 275; SungChang Interfashion
Co., Ltd. v. Stone Mountain Accessories, Inc., No. 12-cv- 7280
(ALC)(DCF), 2013 WL 5366373, at *10 (S.D.N.Y. Sept. 25, 2013).
Contrary to plaintiffs' suggestion to the contrary, the plain

the motion to dismiss the constructive fraudulent conveyance claims.

## 2. Intentional Fraudulent Conveyance

Under New York law, a conveyance may also be avoided if it is made with "actual intent . . . to hinder, delay, or defraud either present or future creditors." DCL § 276. Claims for actual fraudulent conveyance are held to the heightened pleading standard requirements of Rule 9(b). Atlanta Shipping Corp., Inc. v. Chemical Bank, 818 F.2d 240, 251 (2d Cir. 1987). Ordinarily, to satisfy this pleading standard, a plaintiff must allege: (1) the property subject to the transfer, (2) timing of the transfer, and (3) the consideration. In re Saba Enters., Inc., 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009). "Courts, however, have taken a more liberal view when examining allegations of actual fraud that are pleaded by a bankruptcy trustee in the context of a fraudulent conveyance, since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." Id.

The officer and employee defendants make two arguments in support of their motion to dismiss these claims: (1) plaintiffs have not alleged the details of the transfers with sufficient

---

meaning of § 275 requires an allegation not that the transferor intended for old debt to come due after the transfer but that the transferor intended to incur new debt after the transfer. Because the complaints contain no such allegation, they fail to state a claim under "ability to pay" test.

particularity; and (2) plaintiffs have not alleged facts that permit an inference of fraudulent intent. Officer Mem. at 20-21.

a. Pleading with Particularity

Even under the relaxed pleading standard described above, "[p]leadings still must be particular enough to fulfill Rule 9(b)'s purpose: to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." In re Bernard L. Madoff Inv. Securities LLC, 458 B.R. 87, 106 (Bankr. S.D.N.Y. 2011). The officer defendants argue that, even under the relaxed pleading standard, the "allegations must identify the method and specific date of each transfer." Officer Reply at 6. Plaintiffs counter, however, that while they do not allege the specific dates on which each change in control payment was made, the allegations "give adequate notice to the Defendants of the payments sought to be avoided." Pl. Off. Mem. at 23.

The Court agrees with plaintiffs and holds that they have pleaded the transfers with sufficient particularity. The complaints provide a list of the alleged change in control payments recipients and how much was transferred and they broadly outline the circumstances under which the transfers occurred. Compl. ¶¶ 40, 204. The allegations do not suffer from the sort of "opacity" that courts find insufficient under the relaxed pleading standard. In re Bernard L. Madoff, 458 B.R. at 106.

51

b. <u>Inference of Fraudulent Intent</u>

"[T]he intent element of an intentional fraudulent conveyance claim may be alleged generally so long as the plaintiff alleges facts that give rise to a strong inference of fraudulent intent." <u>Saba</u>, 421 B.R. at 642. In the case of a trustee pleading from second-hand knowledge, moreover, "allegations of circumstantial evidence are sufficient to establish fraudulent intent." <u>Id.</u> Specifically, courts look to the following "badges of fraud": (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction." <u>Id.</u> "[T]he existence of several badges of fraud constitutes clear and convincing evidence of actual intent." <u>Id.</u>

The complaints allege the nature of the close relationship between the officers and the Company, allege facts about the Company's financial condition at the time of the transfer, and

allege facts regarding the general chronology of the events in question. The Court finds that these allegations are sufficient to support an inference of fraudulent intent with respect to the officer defendants.[35] Accordingly, the officer defendants' motion to dismiss the intentional fraudulent conveyance claims is denied.

It is a different story with respect to the employee defendants. Unlike the officer defendants, whose close relationships with the Company are made clear in the complaints, the employee defendants are simply identified as having received a payment, without any context as to who they are or the nature of their relationship to the Company. See Carr Joinder at 3. Indeed, the sole allegation about these defendants is that they received a change in control payment. Such threadbare allegations are insufficient to state a claim for intentional fraudulent

---

[35]  Notwithstanding these allegations, the officer defendants argue that these transfers were made "as part of the Board's long-running compensation and incentive scheme and were paid to fulfill" the Company's obligations. Officer Mem. at 21. However, as plaintiffs point out, New York courts have held that the "mere existence of an antecedent debt is not alone sufficient to validate an otherwise fraudulent transfer." Pl. Off. Mem. at 24 (quoting Atlanta Shipping Corp., Inc. v. Chemical Bank, 631 F. Supp. 335 (S.D.N.Y. 1986), aff'd, 818 F.2d 240 (2d Cir. 1987)). In their reply brief, the officer defendants argue that Atlanta Shipping does not undermine their argument because plaintiffs have pleaded "no facts suggesting any alternative intent." Officer Reply at 7 n.10. But, as discussed, the Court holds that the complaints adequately pleaded the badges of fraud as a proxy for directly pleading fraudulent intent.

conveyance. Accordingly, the claims for intentional fraudulent conveyance claims against the employee defendants are dismissed.

* * * * *

For the foregoing reasons, the respective motions to dismiss of the director defendants and the officer defendants are granted in part and denied in part.

SO ORDERED.

Dated:     New York, NY

           December 4, 2020                    JED S. RAKOFF, U.S.D.J.

54